# EXHIBIT A

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| The PLS.com, LLC, a California limited company,<br>*Plaintiff*<br>v.<br>THE NATIONAL ASSOCIATION OF REALTORS,<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:25-cv-05971 |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Tracey Tutor, Compass, Inc., c/o Chahira Soth, Esq.
Crowell & Moring LLP 3 Park Place. 20th Floor, Irvine, CA 92614

*(Name of person to whom this subpoena is directed)*

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: | Date and Time: |
|---|---|
| HIRSCHFELD KRAEMER LLP<br>1299 Ocean Avenue, Suite 750<br>Santa Monica, CA 90401 | 09/11/2026 1:30 pm |

The deposition will be recorded by this method: stenographic and videographic means

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attached Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/20/2026

*CLERK OF COURT*

OR

/s/ Leonard A. Gail

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendant National Association of REALTORS®, who issues or requests this subpoena, are:
Leonard A. Gail, MASSEY & GAIL LLP, 50 E. Washington St., Suite 400, Chicago, IL 60602;
bcarmichael@masseygail.com; 312-283-1590

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:25-cv-05971

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named individual as follows: ______________

______________________________________________________________

______________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________

______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________________
*Server's signature*

______________________________________
*Printed name and title*

______________________________________
*Server's address*

Additional information regarding attempted service, etc.:

**SCHEDULE A**

**DEFINITIONS**

The following definitions shall apply throughout this subpoena:

1. “The Actions” means *ThePLS.com, LLC v. The Nat’l Ass’n of Realtors,* No. 2:20-cv-4790 (C.D. Cal.) (*see* First Amd. Compl., ECF No. 46, attached here to as Exhibit A) and *The PLS.com, LLC v. The Nat’l Ass’n of Realtors*, No. 2:25-cv-05971 (C.D. Cal.) (*see* Compl. ECF No. 1, attached as Exhibit B).

2. “Agent” refers to a licensed professional who facilitates property transactions between buyers and sellers.

3. “Clear Cooperation Policy” refers to the National Association of REALTORS’® Multiple Listing Policy Statement 8.0, which provides that: “Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed m windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.”

4. “Communication” or “Communications” mean, without limitation, any oral, written, or other exchange of thoughts, messages, or information, as by speech, signals, writing, or behavior, including but not limited to, any advice, advisement, announcement, articulation, assertion, contact, conversation, written or electronic correspondence, declaration, discussion, dissemination, elucidation, expression, interchange, memoranda, notes, publication, reception, revelation, talk, transfer, transmission, or utterance. The phrase “Communication between” includes instances where one party addresses the other party, but the other party does not necessarily respond.

5. “Document” or “Documents” has the same meaning as is used in Rule 34 of the Federal Rules of Civil Procedure, and shall be construed in its broadest sense, including without limitation, the final form and all drafts and revisions of any paper or other substance or thing, original or reproduced, and all copies thereof that are different in any way from the original, on which any words, letters, numbers, symbols, pictures, graphics, or any other form of information is written, types, printed, inscribed, or otherwise visibly shown, and also every other form of stored or recorded information, whether on disks, cards, computer memories, or any other medium and/or device whereby stored information can, by any means whatsoever, be printed or otherwise recovered, generated, or displayed in the form of visible, audible, or otherwise perceptible words, letters, numbers, symbols, or graphics. To illustrate (and not to limit) the breadth of this definition, “Document” in this sense includes papers or objects bearing handwritten notes, material written in Braille, contracts, letters, bills, notes, e-mails, voice mails, social media communications, text messages, books, desk calendars, memoranda, envelopes, drafts or partial copies of anything, signs, photographic negatives and prints, video and audio recordings, and data. Each and every draft of a Document is a separate Document from the final version for purposes of these Document requests.

6. “MLS” as defined in Section 1 of NAR’s 2026 Handbook on Multiple Listing Policy refers to a Multiple Listing Service, a private database created, maintained, and paid for by real estate professional to help their clients buy and sell property.

7. “NAR” refers to the National Association of REALTORS®, including each of its predecessors, successors, divisions, subsidiaries, and each other person directly or indirectly, wholly or in part, owned or controlled by it, and each joint venture to which any of them is a party, and all present and former directors, officers, employees, agents, consultants, or other persons acting for or on behalf of any of them.

8. “TheNLS.com” includes, without limitations, all of its locations, predecessors, predecessors-in-interest, subsidiaries, parents, affiliates, past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, franchisees, licensees, owners, shareholders, and partnership relationships.

9. “ThePLS.com, LLC” includes, without limitations, all of its locations, predecessors, predecessors-in-interest, subsidiaries, parents, affiliates, past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, franchisees, licensees, owners, shareholders, and partnership relationships.

10. “Pocket Listing” refers to a listing for the sale of real estate that is not entered into an MLS.

11. “Relating to” or “related to” when referring to any given subject matter, means without limitation any information, document, or thing that in whole or in part, directly or indirectly relates to, alludes to, comments upon, concerns, contradicts, constitutes, comprises, contains, regards, discusses, demonstrates, describes, depicts, embodies, evidences, refers to, pertains to, identifies, states, mentions, deals with, or is in any way relevant to the particular subject matter defined.

12. “You” and “Your” refer to you personally.

13. All other words are given their plain and ordinary meaning.

## INSTRUCTIONS

1. Unless otherwise stated, these Requests seek responsive Documents for the period of January 1, 2017 to the present.

2. In complying with these Requests, You are to produce all responsive Documents within Your possession, custody, or control, along with every family document (such as any appendices, attachments, cover letters, enclosures, exhibits, and schedules), that are in Your

possession, custody, or control, including the custody or control of Your agents and employees. If any portion of a Document or Communication is responsive to any request, the entire Document or Communication should be produced.

3. In answering these requests, provide information that is available to You, not just information within Your knowledge. If no Document in Your possession, custody, or control is responsive to a particular request for production, provide a written response stating so.

4. If You claim privilege as grounds for not fully answering a Request, You should provide a privilege log in accordance with Rule 26 of the Federal Rules of Civil Procedure, see pages 24-27 of the Order Establishing a Protocol for Electronic Discovery ("ESI Order") (ECF No. 53), attached as Exhibit C, and any other applicable order or agreement regarding privilege logs. You may also designate confidential materials in accordance with the Stipulated Protective Order (ECF No. 47), attached as Exhibit D. In the absence of any applicable order or agreement, produce each responsive Document as it is kept in the ordinary course of business, with all metadata intact, and with Bates numbering.

5. These Requests must be construed in the broadest possible manner consistent with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Central District of California. The words "all," "any," "each," "every," "and," and "or" must be construed conjunctively and disjunctively as necessary to make the requests inclusive rather than exclusive. The singular includes the plural and vice versa. Any verb in any tense includes the verb in all its tenses.

6. These Requests for production are continuing. If, after responding, You obtain or become aware of any additional responsive Document, then produce that Document promptly, as required by Federal Rule of Civil Procedure 26(e).

## REQUESTS FOR PRODUCTION

1. All Documents related to Your membership to any MLS of which You are a member.

2. All Documents related to Your cancellation of any memberships to any MLS.

3. All Documents related to Your membership in any real estate trade association.

4. All Documents relating to or constituting all real estate listings You posted to any MLS between January 2019 and the Present.

5. All Documents relating to or constituting all real estate listings You marketed outside of MLSs from January 2019 through the Present, including but not limited those You marketed as Pocket Listings, office exclusives, coming soon listings, and those You listed on non-MLS networks.

6. All Documents relating to or constituting all real estate listings You posted to thePLS.com from January 2017 through the Present.

7. All Documents relating to or constituting all real estate listings You posted to theNLS.com from January 2017 through the Present.

8. All Documents and Communications related to criticism of thePLS.com or theNLS.com.

9. All Documents and Communications related to the NAR's Clear Cooperation Policy (the "CCP"), including but not limited to compliance with the CCP, criticisms of the CCP, problems created by the CCP, benefits created by the CCP, and effects of the CCP on competition.

10. All Communications with the NAR including any NAR employee or representative.

11. All Documents and Communications related to consumer and/or client demand for off-MLS listing services.

12. All Documents and Communications related to Agent demand for off-MLS listing services.

13. All Communications with Christoper Dyson, James Harris, David Parnes, or Mauricio Umansky related to the PLS.com, the NLS.com, or other off-MLS listing services.

14. All Documents and Communications related to The Actions.

15. All Documents related to any formal complaints, investigations, disciplinary actions, and/or lawsuits against You by any individual or entity related to Your use of off-MLS listings.

16. All Documents related to information, disclosures, and/or seller authorization regarding off-MLS listings provided by Your brokerage to sellers.

# A

CHRISTOPHER G. RENNER (*Pro Hac Vice*)
chrisrenner@dwt.com
DOUGLAS E. LITVACK (*Pro Hac Vice*)
douglitvack@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW; Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

JOHN F. MCGRORY, JR. (*Pro Hac Vice*)
johnmcgrory@dwt.com
ASHLEE AGUIAR (*Pro Hac Vice*)
ashleeaguiar@dwt.com
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue; Suite 2300
Portland, OR 97201
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

EVERETT W. JACK, JR. (SBN 313870)
everettjack@dwt.com
SCOTT R. COMMERSON (SBN 227460)
scottcommerson@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street; 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Attorneys for Plaintiff The PLS.com, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| The PLS.com, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>The National Association of Realtors; Bright MLS, Inc.; Midwest Real Estate Data, LLC; and California Regional Multiple Listing Service, Inc.,<br><br>Defendants. | Case No. 2:20-cv-04790-PA-RAO<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Assigned to the Hon. Percy Anderson<br>Courtroom 9A, 9th Floor<br><br>Action Filed: May 28, 2020 |



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

Plaintiff The PLS.com, LLC, ("PLS"), by and through its undersigned attorneys, brings this action for trebled compensatory damages and injunctive relief under the antitrust laws of the United States, and under the laws of the State of California, against the above-named Defendants, demanding a trial by jury. For its First Amended Complaint against Defendants, PLS alleges the following:

## NATURE OF THE CASE

1. For over 50 years, residential real estate in the United States has been primarily marketed through the multiple listing services ("MLSs") owned by members of the National Association of Realtors ("NAR").

2. NAR, by itself and through its affiliates, controls competition in the residential real estate brokerage industry through its members' ownership of most of the nation's MLSs.

3. NAR has frequently used its control over MLSs to exclude new and disruptive market entrants to the benefit of NAR members, and the detriment of consumers. NAR and its members have abused the market power conferred upon them by control over the MLS system time and time again.

4. NAR's ability to control competition in the residential real estate brokerage industry rests on the market power of the MLSs operated by its members.

5. In recent years, the edifice on which NAR's ability to control competition was built had begun to crumble. For the first time in the life of most Americans, an alternative to the NAR-affiliated MLS system had emerged, promising a wave of innovation, competition, and new entry.

6. Home sellers have for years sought to retain the services of licensed real estate professionals to market their homes outside of the NAR-affiliated MLS system. Sellers sought these services for a number of reasons. Many sellers desired for reasons of privacy or security to market their home without the wide exposure that comes from listing a property in NAR-affiliated MLSs. Many sellers desired to test the market for their home without the stigma that comes from listing and then



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

delisting the property on a NAR-affiliated MLS.

7. Listings marketed by licensed real estate professionals outside the NAR-affiliated MLS system are sometimes called "pocket listings." Demand for pocket listing services has skyrocketed in recent years, particularly in large and competitive real estate markets such as Los Angeles, San Francisco, Miami, and Washington D.C. In some of these markets, 20 percent or more of residential real estate was being sold outside the NAR-affiliated MLS system, primarily as pocket listings. NAR recognized in 2018 that NAR members were competing with one another to meet consumer demand for pocket listing services.

8. As consumer demand for pocket listing service grew, so did the need for a centralized, searchable repository of pocket listings. PLS was formed as the "Pocket Listing Service" to meet this need. Pocket listings had historically been marketed bilaterally by licensed real estate professionals, face to face, through phone calls, or by email. By joining PLS, licensed real estate professionals could privately share pocket listings with other licensed real estate professionals while avoiding the exposure of those listings through the NAR-affiliated MLSs. For home sellers and the licensed real estate professionals serving those home sellers, the PLS offered all of the benefits of the NAR-affiliated MLSs while retaining the privacy and discretion that would be lost by listing with NAR-affiliated MLSs. For home buyers and the licensed real estate professionals serving those home buyers, the PLS offered an opportunity to learn about properties that were not widely marketed.

9. The surge in consumer demand for pocket listings, and the rise of a listing network to market pocket listings effectively, was a competitive threat to the viability of the NAR-affiliated MLS system. These market changes also threatened NAR's ability to control competition in the residential real estate brokerage industry.

10. NAR-affiliated MLSs were aware of this competitive threat.



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

Competing MLS systems met together privately and through NAR to discuss this threat and formulated a common plan to eliminate that competitive threat.

11. In September 2019, the largest NAR-affiliated MLSs, including Defendants California Regional Multiple Listing Service, Bright MLS, as well as Defendant Midwest Real Estate Data, jointly authored and published a white paper on pocket listings and the future of the NAR-affiliated MLS system. The white paper provided that "The multiple listing service as we know it is in jeopardy and this call-to-action serves as an impassioned plea to brokers and MLSs to take immediate action." The white paper identified the declining share of properties listed in NAR-affiliated MLSs due to the "persistent, and increasing, presence of off-MLS home marketing" as among the "largest challenges MLSs face[.]" The white paper further noted the risk that one or more private listing networks would obtain a critical mass of pocket listings that "could fuel the trend to power private listing databases in general" which "will soon exceed, or circumvent, the service MLSs offer."

12. PLS was the listing network that NAR-affiliated MLSs feared. Having amassed nearly 20,000 members, PLS had or would have soon attracted a critical mass of members and listings to create a powerful network effect that was likely to quickly lead to substantial market share as new members joined, bringing new listings, attracting in turn more new members and more new listings in a virtuous and self-sustaining cycle. The more competitive future that the NAR-affiliated MLSs feared had arrived.

13. Acting through NAR, the NAR-affiliated MLSs moved swiftly to eliminate the competitive threat from listing networks aggregating pocket listings. In November 2019, NAR promulgated a mandatory rule governing all NAR-affiliated MLSs. The rule, called the Clear Cooperation Policy, requires NAR members participating in NAR-affiliated MLSs to submit their listings to the MLS within one business day of marketing the property to the public. For purposes of



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

the Clear Cooperation Policy, NAR defines marketing a property to the public to include listing on private "multi-brokerage listing sharing networks" such as PLS. NAR members that violate the Clear Cooperation Policy face discipline and punishment by other NAR members.

14. The Clear Cooperation Policy eliminates the viability of the private network of pocket listings that the MLS Defendants and other NAR-affiliated MLSs had identified as a competitive threat. By eliminating the threat to NAR-affiliated MLSs, NAR cements its ability to control competition in the market for residential real estate brokerage services.

15. Through the Clear Cooperation Policy, the Defendants eliminated the possibility of a more competitive future in the market for residential real estate listing network services. A once-in-a-lifetime opportunity for competition in a monopolized market has been lost. Defendants' conduct has harmed competition and consumers, and is illegal.

## PLAINTIFF

16. Plaintiff PLS is a California Limited Liability Company headquartered in Los Angeles, California. At the time the Clear Cooperation Policy was adopted, PLS operated the largest network of licensed real estate professionals marketing pocket listings in the United States.

## DEFENDANTS

17. Defendant NAR is a trade association headquartered in Chicago, Illinois, that establishes and enforces policies and professional standards for its over 1.4 million members. NAR is incorporated under the laws of Illinois. Its 54 state and territorial associations and over 1,200 local associations are members of, and are overseen by, NAR. NAR promulgates rules governing the operation of the approximately 600 MLSs that are affiliated with NAR through their ownership or operation by NAR's state, local and territorial associations. NAR is registered to do business as a non-profit in the state of California and advertises and solicits



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

members in the state. It has more than 185,000 members in California, derives revenue from California, and holds meetings in California. NAR also directs its California-based members to follow rules it promulgates.

18. Defendant California Regional Multiple Listing Service, Inc. ("CRMLS") is the largest MLS in the United States with over 100,000 members who have access to more than 70 percent of listings for sale in California. CRMLS is owned and controlled by NAR members operating through 39 local associations of NAR throughout the State of California. CRMLS is headquartered in Chino Hills, California, and is incorporated under the laws of California. CRMLS is a NAR-affiliated MLS governed and controlled by NAR rules.

19. Defendant Bright MLS, Inc. ("Bright MLS") is a MLS serving the Mid-Atlantic region of the United States with over 88,000 members. Bright MLS is owned and controlled by NAR members operating through 43 local associations of NAR members operating through local associations of NAR throughout the States of New Jersey, Delaware, Maryland, Pennsylvania, West Virginia, the Commonwealth of Virginia, and the District of Columbia. Bright MLS is headquartered in Rockville, Maryland, and is incorporated under the laws of Delaware. In a typical year, Bright MLS will facilitate approximately $70 billion in residential real estate transactions. Bright MLS is a NAR-affiliated MLS governed and controlled by NAR rules.

20. Defendant Midwest Real Estate Data, LLC ("MRED") is a MLS serving northern Illinois, southern Wisconsin, and northwest Indiana with over 45,000 members. MRED is indirectly owned and controlled by NAR members operating through 15 local associations of NAR throughout the States of Illinois, Wisconsin, and Indiana. MRED is headquartered in Lisle, Illinois, and organized under the laws of the Illinois.

## JURISDICTION, STANDING, AND VENUE

21. Plaintiff brings this action to recover damages, including treble



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22. This Court has subject matter jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

23. Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

24. This Court has subject matter jurisdiction of Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state law claims arise out of the same factual nucleus as Plaintiff's federal law claims.

25. This Court has personal jurisdiction over each Defendant and venue is proper in the Central District of California and this division under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because NAR and CRMLS regularly transact business within the Central District of California, and because Bright MLS and MRED formulated, led and joined a conspiracy among NAR members and NAR-affiliated MLSs that expressly aimed their intentional and anticompetitive conduct at California. All of the Defendants knew and specifically intended that their conspiracy would be formulated, negotiated, and implemented in California, would exclude competition in California (where they knew PLS was based), and would harm consumers in California. The Defendants worked in concert to effect NAR's adoption of the Clear Cooperation Policy at a 2019 NAR Convention in California, and each Defendant committed overt acts in furtherance of the Defendants' conspiracy in California. CRMLS, Bright MLS and MRED (together, the "MLS Defendants") were among the MLSs that caused the September 2019 white paper, setting forth the competitive threat from pocket listings and the need for collective action among NAR-affiliated MLSs, to be published from San Juan Capistrano, California.



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

26. Defendants are engaged in, and their activities substantially affect, interstate trade and commerce. Billions of dollars flow across state lines in the mortgage market to finance the sales of residential real estate facilitated by the MLS Defendants.

## RESIDENTIAL REAL ESTATE BROKERAGE

27. State law regulates entry into the residential real estate brokerage services industry. There are two licensee categories: (i) the real estate broker; and (ii) the individual real estate licensee or agent. Brokers supervise agents who work directly with consumers. Agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences. Brokers often provide agents with branding, advertising, and other services that help the agents complete transactions.

28. Although there is no legal impediment to consumers buying and selling homes on their own, the large majority of consumers choose to work with a real estate broker. The substantial majority of residential real estate transactions involve the services of licensed real estate professionals. According to NAR, in 2017, 92 percent of sellers sold their home and 87 percent of buyers purchased their home with the assistance of a real estate broker.

29. The vast majority of licensed real estate professionals active in the residential real estate brokerage services industry are NAR members.

30. NAR promulgates rules and codes of conduct for its members and for its state, territorial and local associations. These associations, in turn, are required to adopt NAR's rules and bylaws and to enforce NAR-promulgated rules upon the licensed real estate professionals comprising the associations.

31. Until recently, with the surge in consumer demand for pocket listings, NAR-affiliated MLSs facilitated the vast majority of residential real estate transactions.

32. MLSs are joint ventures among virtually all licensed real estate



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

professionals operating in local or regional areas. Licensed real estate professionals regard participation in their local MLS as critical to their ability to compete with other licensed real estate professionals for home sellers and buyers. The MLS combines its members' home listings information into a database, usually in electronic form. The MLS then makes these data available to all licensed real estate professionals who are members of the MLS. By listing in the MLS, a licensed real estate professional can market properties to a large set of potential buyers. By searching the MLS, a licensed real estate professional representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs. An MLS is thus a market-wide joint venture of competitors that possesses substantial market power: to compete successfully, a licensed real estate professional must be a member; and to be a member, a licensed real estate professional must adhere to any restrictions that the MLS imposes.

33. The state, territorial and local associations of NAR (sometimes referred to as "Realtor® associations") own NAR-affiliated MLSs. NAR requires each of these associations to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy.

34. NAR does not require that licensed real estate professionals be NAR members to participate in NAR-affiliated MLSs. In Alabama, California, Florida, and Georgia, NAR-affiliated MLSs are prohibited by law from promulgating any such requirement. As a result, many licensed real estate professionals that are not NAR members participate in NAR-affiliated MLSs.

35. NAR-affiliated MLSs must adopt new or amended NAR policies. NAR's Handbook on Multiple Listing Policy states that NAR-affiliated MLSs "must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

Case 1:26-mc-00525 Document 3-1 Filed 10/24/26 Page 20 of 130

36. One of the many benefits that NAR provides to its state, territorial and local associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these valuable insurance benefits from associations and MLSs that fail to comply with these mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

37. NAR reviews the governing documents of its state, territorial and local associations to ensure compliance with its rules. NAR requires its state, territorial and local associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## THE NAR-AFFILIATED MLS SYSTEM

38. For decades, the NAR-affiliated MLSs have often been regarded as a permanent, unavoidable, and inevitable feature of the residential real estate brokerage industry. NAR-affiliated MLSs have for decades enjoyed durably high market shares in markets across the country.

39. The majority of NAR-affiliated MLSs, including Bright MLS, are managed as for-profit enterprises. Regardless of their corporate form, the majority of NAR-affiliated MLSs, and MRED, serve directly or indirectly as the primary revenue stream for their owners, the state, territorial and local associations of NAR, whose shareholders use the funds for other purposes.

40. All NAR-affiliated MLSs are actual or potential competitors with other NAR-affiliated MLSs. NAR-affiliated MLSs frequently have overlapping service areas and licensed real estate professionals may choose to pay for access to only one of several available NAR-affiliated MLSs.


DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

41. NAR-affiliated MLSs charge licensed real estate professionals for access to each MLS. The prices charged by NAR-affiliated MLSs to licensed real estate professionals for access to the MLS are excessive, above competitive levels, and unrelated to the MLSs' cost of service.

42. NAR-affiliated MLSs have been slow to innovate and unresponsive to consumer demand. According to NAR-affiliated MLSs writing in 2019, "the software used in most MLSs has become obsolete."

43. According to a white paper commissioned by NAR-affiliated MLSs in 2017, "Almost everyone interviewed for this study feels that the MLS industry has meandered aimlessly for over a decade. There are of course various reasons, but the dominant contributing factor is the fact that most MLS organizations are owned and governed by Realtor® associations. And Realtor® associations, and their fragmentally managed committee structure, are simply not geared to compete in today's new, bold, fast-paced technology arena."

44. A Chief Executive Officer of one NAR-affiliated MLS stated in 2017, "As an industry, we have outdated technology that is the result of the community we represent resisting change. There are perhaps 30 to 40 MLSs across the country that have it right or are moving toward the right direction, but there are also 650 MLS organizations that are continuing to rest on how they have done it for decades. They are ignoring the fact that the marketplace and the needs of the user have changed, and their failure to respond is spiraling the MLS industry to the bottom."

45. Another Chief Executive Officer of a NAR-affiliated MLS stated in 2017, "The MLS has a business model problem. The industry has forgotten who their customers are. The industry's longstanding 'product in a box' solution is no longer valid and the platform it is delivered on is antiquated. In essence, the MLS is still trying to operate as a gatekeeper and continues to block real estate professionals from having access to the best-in-class products they need to help them do their job."



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

46. The regionally-fragmented system of NAR-affiliated MLSs is inefficient and imposes unnecessary and redundant costs on licensed real estate professionals. According to an executive of a large real estate brokerage in 2017, "Mid-sized and large brokerages that operate across states and regions face unique challenges in having to belong to multiple MLSs, and that can be costly, redundant and inefficient." According to a 2015 study commissioned by NAR, "An estimated $250-$500 million in MLS fees are attributable to duplication, redundancy, and excess among MLSs every year. If economies of scale were implemented nationwide, MLS fees would be significantly less."

47. There is consumer demand for a listing network aggregating listings nationwide. According to a 2015 study commissioned by NAR, "A national MLS has been talked about for decades, but never before has the likelihood of it actually becoming a reality been so high."

48. One driver of consumer demand for a national listing network service is attributable to large brokerages, which purchase listing network services nationwide. These brokerages can belong to dozens of MLSs across the country with often different rules, policies, technology and underlying systems. In 2013, dozens of large brokerages threatened to pull out of NAR-affiliated MLSs and create their own multi-brokerage listing network, voicing concerns about MLSs overcharging for MLS services.

49. Another driver of consumer demand for a national listing network service is attributable to brokerages that specialize in serving clients interested in listing properties that may be of interest to buyers nationwide, clients interested in considering the purchase of properties nationwide, or both. These properties are sometimes relatively unique and have high listing prices.

**POCKET LISTINGS CREATE THE OPPORTUNITY FOR COMPETITION**

50. MLSs, like other networks, exhibit what economists call "network externalities," meaning the value of the network services is a function of the number



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

of trading partners connected by the network.

51. The dominance of NAR-affiliated MLSs is a function of the percentage share of listings submitted to NAR-affiliated MLSs by licensed real estate professionals. When all or almost all listings are submitted to the NAR-affiliated MLSs, the possibility of effective competition to those MLSs is nil. Conversely, when listings are not submitted to the MLS and are marketed by licensed real estate professionals in other ways, the possibility of competition to the MLSs emerges. And when a critical mass of listings becomes available for a competing listing network, the possibility of head-to-head, network-to-network competition becomes real.

52. The dominance of NAR-affiliated MLSs is neither inevitable nor efficient. The surge in consumer demand for pocket listings created, for the first time in living memory, the possibility of competition for the NAR-affiliated MLSs. Pocket listings presented the opportunity for a competing listing network to aggregate a critical mass of listings that could support a listing network competing with the NAR-affiliated MLSs.

53. According to a 2015 study commissioned by NAR, "Off-MLS listings may contribute to the unraveling of the MLS as we know it, and its replacement by a private network that serves to benefit a certain group of participants."

54. There is substantial and unmet demand among licensed real estate professionals, and among the customers they serve, for an alternative to the NAR-affiliated MLSs.

55. According to a 2015 study commissioned by NAR, "A number of industry initiatives suggest that the current MLS-centric era might be coming to an end. After half a century of operating as the only gateway, there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."

56. According to the President and Chief Executive Officer of a network of



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

large real estate brokerage firms in 2017, "MLS has been of great value to agents, but their loyalty to the MLS is waning … For the first time, the industry has entered a world where there are realistic and legitimate attempts to create alternatives to the MLS that exists today."

57. As one licensed real estate professional wrote after the NAR Clear Co-operation Policy was adopted, "I long for the day when a private company decides to create an MLS platform that competes with association-owned MLSs freeing us from the clutches of NAR."

**PLS WAS A COMPETITIVE THREAT TO NAR'S MLS SYSTEM**

58. PLS was formed in 2017 to address the demand of licensed real estate professionals, and for the consumers they serve, for an alternative to the NAR-affiliated MLS system.

59. Like the NAR-affiliated MLSs, PLS is a private network limited to licensed real estate professionals. All licensed real estate professionals were eligible to be members in the PLS.

60. The PLS, like the NAR-affiliated MLSs, is a means for licensed real estate professionals to cooperate in the sale of residential real estate. Like the NAR-affiliated MLSs, PLS operates an electronic database of listings submitted by PLS members with an offer of compensation to other PLS members that can find a buyer. Like the NAR-affiliated MLSs, PLS then makes these data available to all licensed real estate professionals who are members of the PLS.

61. Unlike the NAR-affiliated MLSs, licensed real estate professionals listing on PLS could share as much or as little information about the listing as their client desired. In this way, the PLS combined the powerful network efficiencies of the MLS with the privacy and discretion of the pocket listing.

62. Before PLS was launched, there was no place for licensed real estate professionals operating in separate brokerage firms to privately list, search, organize and share information about pocket listings.



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

63. PLS's fees to licensed real estate professionals would have been substantially lower than the fees charged for similar services to licensed real estate professionals by the NAR-affiliated MLSs.

64. PLS was designed and marketed as a national platform, unlike the fragmented NAR-affiliated MLS system that imposes duplicative and burdensome fees on brokerages operating in multiple geographic markets.

65. PLS was an actual or potential competitor to every single NAR-affiliated MLS, and each MLS Defendant. At the time the Clear Cooperation Policy was adopted, PLS had members across the country, including in the service areas of the MLS Defendants.

66. PLS launched successfully and grew quickly. At the time the Clear Cooperation Policy was adopted, nearly 20,000 licensed real estate professionals were cooperating to sell billions of dollars of residential real estate listings nationwide.

67. PLS was a serious competitive threat to the NAR-affiliated MLS system, and to the MLS Defendants.

68. NAR and the NAR-affiliated MLSs, and the MLS Defendants, were aware of this competitive threat and acted through the Clear Cooperation Policy and otherwise to eliminate this threat.

## NAR AND ITS AFFILIATES EXCLUDE COMPETITION

69. For the NAR-affiliated MLSs, pocket listings are a form of lost market share. The NAR-affiliated MLSs were concerned that a critical mass of pocket listings could be aggregated in a competing listing network, making possible for the first time network-to-network competition to the MLS system.

70. NAR-affiliated MLSs, and MRED, recognized that they could not unilaterally eliminate the competitive threat that pocket listings posed, in part because pocket listings are a national phenomenon and could create the possibility of a nationwide competitor to the MLS system. NAR-affiliated MLSs, and MRED,





DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

recognized the need for collective action among NAR-affiliated MLSs, in the form of a change to the mandatory provisions in NAR's Handbook on Multiple Listing Policy that would require all NAR-affiliated MLSs to take action to stamp out the possibility of competitive entry presented by the rise of pocket listings.

71. In August 2019, NAR's MLS Technology and Emerging Issues Advisory Board voted to recommend the adoption of what would become the Clear Cooperation Policy at the upcoming NAR Convention in San Francisco, California. The members present for this vote included executives of NAR-affiliated MLSs, and Defendant MRED. On information and belief, MRED's representative participated in this NAR Advisory Board meeting as a representative of the Council of Multiple Listing Services ("CMLS"), an association of approximately 200 MLSs, including NAR-affiliated MLSs and the MLS Defendants.

72. NAR admits that the Clear Cooperation Policy was formulated and advanced by the NAR-affiliated MLSs, and by MRED. According to NAR, "The association's MLS Technology and Emerging Issues Advisory Board, a group made up of brokers and MLS executives, developed the proposal in consultation with brokerage and MLS leaders across the industry."

73. NAR-affiliated MLSs around the country communicate frequently and privately among themselves regarding pocket listings, using internet forums and social media, and through CMLS.

74. MRED's Chief Executive Officer admits that these private interfirm communications among NAR-affiliated MLSs, MRED, and the other MLS Defendants, were the means by which the Clear Cooperation Policy was formulated and advanced.

75. In September 2019, Bright MLS, MRED, and CRMLS were among the signatories of the white paper issued by the largest NAR-affiliated MLSs that called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate





DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

such listings.

76. On October 16, 2019, Defendant Bright MLS adopted a version of what would become the Clear Cooperation Policy, before having any obligation under NAR rules or otherwise to do so.

77. On or around the same day, Defendant MRED published a statement supporting adoption by NAR of the Clear Cooperation Policy at the upcoming NAR Convention.

78. On October 17 and 18, 2019, NAR-affiliated MLSs, MRED, and the other MLS Defendants, met at a CMLS conference in Salt Lake City, Utah to discuss the competitive threat presented by pocket listings and the need for NAR to take action at the upcoming NAR Convention to eliminate that threat through adoption of the Clear Cooperation Policy.

79. On October 17, 2019, the Chief Executive Office of MRED addressed the assembled representatives of the NAR-affiliated MLSs at the CMLS conference. MRED's Chief Executive Officer, who had attended the August NAR meeting where the Clear Cooperation Policy was first proposed and recommended, explained that the Clear Cooperation Policy was motivated by concerns that pocket listings were "making the MLS less valuable." At this October 2019 CMLS conference, representatives of the assembled NAR-affiliated MLSs were provided with copies of MRED's published statement in support of the Clear Cooperation Policy and urged to review it.

80. On October 17, 2019, the Chairman of Bright MLS addressed representatives of the NAR-affiliated MLSs at the CMLS conference, recited the fact that Bright MLS the day before had adopted a policy banning pocket listings, and urged the assembled NAR-affiliated MLSs to adopt similar policies. The Chairman of Bright MLS also urged the representatives of the NAR-affiliated MLSs to attend the upcoming NAR Convention, and to work as a group at that meeting to ensure NAR's adoption of the Clear Cooperation Policy.



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

81. Among other things, the Chairman of Bright MLS stated "Now, the people who want to do pocket listings? They're a little pissed. They'll get over it. We need to not worry about it. Because that's bad for our industry, right? All right, let me tell you what we all need to do. We have an opportunity in front of us to make, put this policy into effect in November. And Bright adopted it yesterday, MRED's already adopted it, other people are already doing it, but we really need to get it through."

82. The Chairman of Bright MLS continued on: "So what do we need to do? We need to go back and talk to your Boards of Directors, talk to your big brokers, and make sure that they understand we're talking pocket listings and not everything else and make sure that they understand. And then you need to make a policy statement. What are you guys going to do? And then you need to come to that MLS forum, and you need to line up at the microphone and say 'Bright MLS, we're all in. 8.0. Go.'" What would become the Clear Cooperation Policy was referred to at this time as MLS Statement 8.0.

83. The Chairman of Bright MLS explained to the representatives of the assembled NAR-affiliated MLSs that he anticipated a degree of resistance to passage of the Clear Cooperation Policy at the upcoming NAR Convention, in part from NAR members who wished to continue to offer pocket listings.

84. The Chairman of Bright MLS urged the representatives of the assembled MLSs to contact members of their MLS who were on NAR's Board of Directors to advocate for the adoption of the Clear Cooperation Policy at the upcoming NAR Convention.

85. The Chairman of Bright MLS urged the representatives of the assembled NAR-affiliated MLSs to take collective action in the State of California to effect the adoption of the Clear Cooperation Policy. Specifically, the Chairman of Bright MLS said "I look forward to seeing you in San Francisco. I look forward to us, in this room, getting this through."



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

86. In November 2019, the Defendants gathered in San Francisco to take action on the Clear Cooperation Policy. On November 9, 2019, NAR's Multiple Listing Issues and Policies Committee approved the Clear Cooperation Policy by a voice vote, sending the Policy to NAR's Board of Directors. Executives of the NAR-affiliated MLSs, including Bright MLS, and MRED, attended this meeting and spoke in support of the Clear Cooperation Policy. As had been discussed and planned at the October CMLS conference, other NAR-affiliated MLSs did the same. At this meeting, elimination of competition to NAR-affiliated MLSs from networks aggregating pocket listings was cited as a reason for passage of the Clear Cooperation Policy.

87. NAR's Executive Committee reviewed and discussed the Clear Cooperation Policy at the San Francisco meeting on November 10, 2019. NAR's Board of Directors approved the Clear Cooperation Policy at the San Francisco meeting on November 11, 2019.

88. NAR adopted the Clear Cooperation Policy over the complaints of some NAR members, who informed NAR that the policy was anticompetitive and likely illegal.

89. The text of the Clear Cooperation Policy provides:

> "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. (Adopted 11/19)."

90. The Clear Cooperation Policy was effective January 1, 2020, and was included as a mandatory rule in the 2020 version of the NAR Handbook on Multiple



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

Listing Policy. NAR required that all NAR-affiliated MLSs, including Bright MLS and CRMLS, modify their rules to conform to the Clear Cooperation Policy by May 1, 2020. NAR admits that all NAR-affiliated MLSs, including Bright MLS and CRMLS, must adopt and enforce the Clear Cooperation Policy. According to NAR, "By establishing a national policy, it is mandatory that all REALTOR® Association MLSs adopt the policy and have the same consistent standard."

91. NAR admits that there are no exceptions for properties that are "publicly marketed." According to NAR, "The new policy does not include an 'opt out.' Any listing that is 'publicly marketed' must be filed with the service and provided to other MLS Participants for cooperation within (1) one business day."

92. Previously, NAR-affiliated MLSs had generally allowed members to withhold listings from the MLS if the seller of the property so desired. The Clear Cooperation Policy eliminates this possibility, and in that way renders the provision of residential real estate brokerage services unresponsive to consumer demand.

93. The Clear Cooperation Policy does, however, have an exception that allows brokerages to maintain so-called "office listings," or listings marketed entirely within a brokerage firm, without submission of those listing to the MLS.

94. NAR-affiliated MLSs, including Bright MLS and CRMLS, enforce the Clear Cooperation Policy by monitoring adherence to the policy, encouraging MLS members to report their colleagues using pocket listings, and through fines for non-compliance. For example, one MLS in South Florida, a market where consumer demand for pocket listings is high, describes the penalties it levies for violations of the Clear Cooperation Policy as "severe," including maximum fines of up to $15,000 and possible suspension or termination of access to the MLS. The penalties imposed by the NAR-affiliated MLSs for violations of the Clear Cooperation Policy are intended to, and in fact do, make violations of the Clear Cooperation Policy cost-prohibitive for NAR members, and are a constructive refusal to offer MLS services to NAR members that violate the Clear Cooperation



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

Policy.

95. Since the adoption of the Clear Cooperation Policy, NAR-affiliated MLSs have operated, or planned to operate, their own private listing networks, effectively allowing their members to market off-MLS listings under the auspices of the NAR-affiliated MLSs without violation of the Clear Cooperation Rule. MRED has also operated a private listing network.

96. NAR-affiliated MLSs and CMLS have admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS.

**RELEVANT MARKET**

97. PLS and the NAR-affiliated MLSs, including Bright MLS and CRMLS, and MRED, compete to offer listing networks that facilitate the sale of residential real estate listings among licensed residential real estate professionals in the United States.

98. The provision of listing network services to licensed real estate professionals for the sale of residential real estate listings is a relevant antitrust market. Consumers of listing network services for the sale of residential real estate listings view these networks, including the NAR-affiliated MLSs, MRED and PLS, as substitutes for each other. A hypothetical monopolist of listing network services for the sale of residential real estate listings could profitably impose a small but significant, non-transitory increase in price above competitive levels.

99. Listing network services are not a two-sided transaction market because listing networks do not involve a simultaneous sale between buyers and sellers of real estate. No transaction between buyers and sellers occurs on these networks. The networks simply list available residential real estate for sale and charges brokerages monthly fees to access the network, regardless of whether their agents represents buyers, sellers, or both. Access to the listing network gives real estate agents the ability to list properties for sale or view available properties for


DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

sale.

100. One relevant geographic market is nationwide. Licensed real estate professionals and their customers seek listing network services that aggregate listings nationwide, from across the United States. In the alternative, each and every service area of a NAR-affiliated MLS, as well as the service areas of each MLS Defendant, is a relevant geographic market. On information and belief, each of the MLS Defendants has enjoyed a durably high share of over 65 percent of residential real estate listings marketed by licensed real estate professionals in their respective service areas.

101. The Defendants collectively have substantial market power in the relevant market or markets, however defined. Substantial barriers to entry exist to protect that market power, as shown by the durably high market shares enjoyed by the NAR-affiliated MLSs and NAR's ability to exclude competition. One substantial barrier to entry are the network effects that accrue to the NAR-affiliated MLSs as a result of their large market shares. The value of an MLS to licensed real estate professionals is a function of its market share. The greater the market share, the larger the network effects that accrue to the MLS, and the more important access to the MLS is to licensed real estate professionals. NAR and NAR-affiliated MLSs, including Bright MLS and CRMLS, and MRED, have the power to profitably elevate the prices paid by licensed real estate professionals for access to listing network services above the competitive level, and to impose onerous conditions of access on licensed real estate professionals, including the Clear Cooperation Policy.

## DEFENDANTS' UNLAWFUL CONDUCT

102. The Defendants agreed with one another to exclude PLS. The Defendants had a conscious commitment to a common scheme to prevent the emergence of a viable competitor to NAR-affiliated MLSs, to exclude PLS from the relevant market, and to eliminate PLS as an effective competitor. Defendants took



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

overt acts in furtherance of this conspiracy.

103. NAR is a combination or conspiracy among its members, who are licensed real estate professionals who compete with one another. The members of NAR, as a group and through the Board they elect and the staff they indirectly employ, have agreed to, adopted, maintained, and enforced rules, including the Clear Cooperation Policy, affecting how members compete to provide brokerage services, participate in NAR-affiliated MLSs, and access MLS services. NAR's members agree (and adhere) to NAR's code of ethics, bylaws, and rules as a condition of membership. NAR's rules, including the Clear Cooperation Policy, are therefore the product of agreements and concerted action among its members, including the owners of the NAR-affiliated MLSs. that operate and control the MLS Defendants.

104. The adoption and enforcement of the Clear Cooperation Policy by the NAR-affiliated MLSs is also the product of agreements and concerted action (i) among the MLS Defendants and (ii) between and among each NAR-affiliated MLS and their members. Each NAR-affiliated MLS is owned and controlled by associations of competing real estate brokers, who collectively have the power to admit new members, propose bylaws, and enact rules for members. The NAR-affiliated MLSs' rules are an agreement among competitors that define the way in which they will compete with one another.

105. The Clear Cooperation Policy and the overt acts taken by NAR and NAR-affiliated MLSs in formulating, adopting, implementing, and enforcing that Policy, are unreasonable restraints of trade. Each of the MLS Defendants joined the conspiracy to formulate and adopt the Clear Cooperation Policy for their own financial benefit and to eliminate the threat posed by upstart networks such as the PLS, and took overt acts in furtherance of that conspiracy.

106. The Clear Cooperation Policy imposes an "all or nothing" term on licensed real estate professionals that seek to use listing networks: the licensed real





DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

estate professional must either submit all such listings to the NAR-affiliated MLSs, or risk losing access to the NAR-affiliated MLSs.

107. The "all or nothing" term imposed on licensed real estate professionals by the Clear Cooperation Policy is exclusionary.

108. Because licensed real estate professionals generally believe that they must submit at least a portion of their listings to NAR-affiliated MLSs to serve their customers, the Clear Cooperation Policy predictably ensures that all listings are submitted to NAR-affiliated MLSs.

109. By ensuring that all listings are submitted to NAR-affiliated MLSs, the Clear Cooperation Policy eliminates the ability of listing networks that compete with the NAR-affiliated MLSs to feature listings that are not on the NAR-affiliated MLSs, and ensures that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network.

110. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy degrades the quality of competing listing networks, reduces the incentives of licensed real estate professionals to use those competing listing networks, and makes those competing listing networks less effective competitors to the NAR-affiliated MLSs.

111. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy imposes a penalty on the use of competing listing networks and creates strong economic incentives for licensed real estate professionals to purchase listing network services exclusively from NAR-affiliated MLSs. By ensuring that licensed real estate professionals accessing listings through a competing listing network pay twice for access to the same listings, the Clear Cooperation Policy creates strong economic incentives for licensed real estate professionals to exclusively use NAR-affiliated MLSs to avoid the surcharge imposed by the Clear Cooperation Policy on



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

the use of competing listing networks.

112. The Clear Cooperation Policy has had actual and substantial anticompetitive effects by eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS, or any other listing network, thereby harming competition in the market for the provision of listing network services to licensed real estate professionals.

113. By eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS or any other listing network, the Clear Cooperation Policy forecloses competing listing networks from access to a critical mass of listings necessary to obtain significant network effects and compete with the NAR-affiliated MLSs in the relevant market(s). All or nearly all active licensed real estate professionals depend upon access to NAR-affiliated MLSs.

114. Through the Clear Cooperation Policy, NAR and the NAR-affiliated MLSs maintained the cost of listing network services for residential real estate listings above a competitive level, and otherwise stifled competition in the market for listing network services for residential real estate listings. In that way, the conduct of NAR and the MLS Defendants harmed (i) real estate professionals serving both buyers and sellers of residential real estate services that desired to use listing networks other than those operated by the NAR-affiliated MLSs, and also (ii) those buyers and sellers of residential real estate.

115. The Clear Cooperation Policy also harmed consumers and competition by eliminating from the market a form of real estate brokerage services desired by consumers, and which lowered barriers to entry for listing networks competing with the NAR-affiliated MLSs and MRED. There was substantial consumer demand for pocket listings. Before the Clear Cooperation Policy, licensed real estate professionals, including but not limited to NAR members, competed to offer pocket listings, and listing networks that competed with the NAR-affiliated MLSs and


DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

Case 1:26-mc-00525 Document 3-1 Filed 10/24/26 Page 36 of 130

MRED were formed. Through the Clear Cooperation Policy, NAR restrained the ability of licensed real estate professionals to offer those services. Because NAR and its members collectively have market power, NAR's restraint on the ability of licensed real estate professionals to offer pocket listings has excluded competition in the relevant market(s), restricted output of residential real estate brokerage services and rendered the provision of those services unresponsive to consumer demand.

116. There is no cognizable or plausible procompetitive justification for the Defendants' unlawful conduct, or one that outweighs its anticompetitive effects. NAR's tolerance of off-MLS listings when privately marketed by NAR members that do not compete with the NAR-affiliated MLSs as listing networks (the "office listing" exclusion) or under the auspices of NAR-affiliated MLSs shows that NAR's asserted justifications for the Clear Cooperation Policy are pretext, and illuminate the purpose and effect of the Clear Cooperation Policy as the elimination of competition to the NAR-affiliated MLSs in the relevant market(s) from PLS and other licensing networks not affiliated with NAR.

117. For nearly 60 years, NAR's Bylaws have recognized that forcing NAR members to list properties in the MLS in the routine provision of real estate brokerage services is improper and not reasonably related to any legitimate business justification. Since 1960, Interpretation No. 1 of Article 1, Section 2 of NAR's Bylaws has provided that "A requirement to participate in a Multiple Listing Service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership. When a Multiple Listing Service is available, is well operated and properly organized, it is the duty of the REALTOR® to consider thoroughly whether he can serve the best interests of his clients by participating in it. The decision, however, must be his own. As a REALTOR®, it is possible for him to conduct business in an ethical and efficient manner without participating in a Multiple Listing Service. Therefore, his participation must not be a requirement of



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

REALTOR® membership."

118. According to NAR's handbook on Multiple Listing Policy, "Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership."

119. The Clear Cooperation Policy does not eliminate or prevent any free-riding at the expense of NAR, NAR members, or the NAR-affiliated MLSs. NAR does not itself provide MLS services. NAR can and does charge membership fees, and can and does recoup the costs of providing its services in those fees. The NAR-affiliated MLSs charge a membership fee for access to their listing networks, and can and do recoup the costs of providing listing network services in those fees. The membership fees charged by the NAR-affiliated MLS do not generally vary depending on the number of listings submitted by NAR members to the MLS. PLS members that seek to list properties on the PLS while also accessing a NAR-affiliated MLS are not free-riding on NAR members that only submit listings to NAR-affiliated MLS because PLS members that continue to also access the NAR-affiliated MLS continue to pay fees to the NAR-affiliated MLSs. There are no uncompensated services being provided by NAR, NAR members or NAR-affiliated MLSs to members of the PLS. Instead, the Defendants advocated for and/or adopted the Clear Cooperation Policy as a means of preventing the continued exponential growth of a competitor that was providing a lower cost and nationwide listing service.

120. The Clear Cooperation Policy is also overbroad and restrains competition unnecessarily. The Clear Cooperation Policy was passed by NAR members but limits the ability of licensed real estate professionals who are not NAR members to compete using alternative listing network services because even non-



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel: (202) 973-4274
Fax: (202) 973-4474

NAR members generally depend upon access to the NAR-affiliated MLSs for at least some of their business. NAR has no legitimate business justification for using NAR rules to restrain the ability of non-NAR members to deal with PLS and other listing networks that compete with the NAR-affiliated MLSs. The overbreadth of the Clear Cooperation Policy illuminates its anticompetitive purpose and effect.

121. PLS suffered injury and damages as a result of Defendants' unlawful conduct. Adoption and implementation of the Clear Cooperation Policy had the natural and intended effect on PLS's business operations. Listings were removed from PLS and submitted instead to NAR-affiliated MLSs. Agent participation in PLS declined. PLS's access to capital was constrained. PLS was foreclosed from the commercial opportunities necessary to innovate and grow.

122. Injury to PLS was the direct, foreseeable and intended result of the Defendants' conduct. The Defendants' conduct simultaneously harmed PLS and consumers in the relevant market by excluding PLS and thereby artificially maintaining or increasing the prices paid by licensed real estate professionals for listing network services for the sale of residential real estate. Although the mechanism of injury to PLS and to licensed real estate professionals (and thereby to consumers) is the same, the damages caused by Defendants' conduct in the form of higher prices is distinct from, and not duplicative of, the damages caused to PLS, which take the form of lost profits and damaged equity and goodwill.

//

//

//

//

//

//

//



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

## PLS'S CLAIMS FOR RELIEF

## COUNT ONE

## (Violation of the Sherman Act)

123. Plaintiff hereby restates Paragraphs 1 through 122 of this Complaint. The Defendants' conduct as alleged herein are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

124. The Defendants' conduct has caused injury and damage to PLS in the form of lost profits.

125. The Defendants' conduct has caused injury and damage to PLS in the form of lost equity and goodwill, diminishing the value of PLS as a going concern.

## COUNT TWO

## (Violation of the Cartwright Act)

126. Plaintiff hereby restates Paragraphs 1 through 122 of this Complaint. The Defendants' conduct as alleged herein are unreasonable restraints of trade in violation of the Cartwright Act, Bus. & Prof. Code § 16720(a)-(c).

127. The Defendants' conduct has caused injury and damage to PLS in the form of lost profits.

128. The Defendants' conduct has caused injury and damage to PLS in the form of lost equity and goodwill, diminishing the value of PLS as a going concern.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief and judgment against Defendants as follows:

1. Enter an Order permanently enjoining the Defendants from enforcing the Clear Cooperation Policy or any variant of that policy;

2. Award compensatory and trebled damages in favor of the Plaintiff and against all Defendants, jointly and severally, including all interest thereon;

3. Award Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and



DAVIS WRIGHT TREMAINE LLP
1919 PENNSYLVANIA AVE., NW; STE. 800
WASHINGTON, DC 20006
Tel; (202) 973-4274
Fax: (202) 973-4474

4. Any other and further relief as the Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: July 20, 2020

DAVIS WRIGHT TREMAINE LLP

By: */s/ Scott R. Commerson*

CHRISTOPHER G. RENNER
(*Pro Hac Vice*)
chrisrenner@dwt.com
DOUGLAS E. LITVACK (*Pro Hac Vice*)
douglitvack@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW; Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

JOHN F. MCGRORY, JR.
(*Pro Hac Vice*)
johnmcgrory@dwt.com
ASHLEE AGUIAR
ashleeaguiar@dwt.com
(*Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue; Suite 2300
Portland, OR 97201
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

EVERETT W. JACK, JR. (SBN 313870)
everettjack@dwt.com
SCOTT R. COMMERSON (SBN 227460)
scottcommerson@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street; 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

*Attorneys for Plaintiff*
*The PLS.com, LLC*

# B

Christopher G. Renner (D.C. Bar No. 1025699)*
cgrenner@dhillonlaw.com
(571) 430-2240 (voice and fax)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
*Additional Counsel on Signature Page*
* *pro hac vice* forthcoming

Brandon Q. Tran (CA Bar No. 223435)
btran@dhillonlaw.com
(949) 340-1968 (voice and fax)
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

***Attorneys for Plaintiff* The PLS.com, LLC**

**IN THE UNITED STATES DISTRICT COURT
FOR CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION**

| | |
|---|---|
| **The PLS.com, LLC**, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>**The National Association of Realtors**,<br><br>Defendant. | Case No. 2:25-cv-05971<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff The PLS.com, LLC, ("PLS"), by and through its undersigned attorneys, brings this action for trebled compensatory damages under the antitrust laws of the United States against the above-named Defendant, demanding a trial by jury. For its Complaint against Defendant National Association of Realtors ("NAR"), PLS alleges the following:

## NATURE OF THE CASE

1. For over 50 years, residential real estate in the United States has been primarily marketed through the multiple listing services ("MLSs") owned by members of the NAR.

2. NAR, by itself and through its affiliates, controls competition in the residential real estate brokerage industry through its members' ownership of most of the nation's MLSs.

3. NAR has frequently used its control over MLSs to exclude new and disruptive market entrants to the benefit of NAR members, and the detriment of consumers. NAR and its members have abused the market power conferred upon them by control over the MLS system time and time again.

4. NAR's ability to control competition in the residential real estate brokerage industry rests on the market power of the MLSs operated by its members.

5. In recent years, the edifice on which NAR's ability to control competition was built had begun to crumble. For the first time in the life of most Americans, an alternative to the NAR-affiliated MLS system had emerged, promising a wave of innovation, competition, and new entry.

6. Home sellers have for years sought to retain the services of licensed real estate professionals to market their homes outside of the NAR-affiliated MLS system. Sellers sought these services for a number of reasons. Many sellers desired for reasons of privacy or security to market their home without the wide exposure that comes from listing a property in NAR-affiliated MLSs. Many sellers desired to test the market for their home without the stigma that comes from listing and then delisting the property on a NAR-affiliated MLS.

7. Listings marketed by licensed real estate professionals outside the NAR-affiliated MLS system are sometimes called "pocket listings." Demand for pocket listing services has skyrocketed in recent years, particularly in large and competitive real estate markets such as Los Angeles, Orange County, San Francisco, Miami, and

Washington D.C. In some of these markets, 20 percent or more of residential real estate was being sold outside the NAR-affiliated MLS system, primarily as pocket listings. NAR recognized in 2018 that NAR members were competing with one another to meet consumer demand for pocket listing services.

8. As consumer demand for pocket listing service grew, so did the need for a centralized, searchable repository of pocket listings. PLS was formed as the "Pocket Listing Service" to meet this need. Pocket listings had historically been marketed bilaterally by licensed real estate professionals, face to face, through phone calls, or by email. By joining PLS, licensed real estate professionals could privately share pocket listings with other licensed real estate professionals while avoiding the exposure of those listings through the NAR-affiliated MLSs. For home sellers and the licensed real estate professionals serving those home sellers, the PLS offered all of the benefits of the NAR-affiliated MLSs while retaining the privacy and discretion that would be lost by listing with NAR-affiliated MLSs. For home buyers and the licensed real estate professionals serving those home buyers, the PLS offered an opportunity to learn about properties that were not widely marketed.

9. The surge in consumer demand for pocket listings, and the rise of a listing network to market pocket listings effectively, was a competitive threat to the viability of the NAR-affiliated MLS system. These market changes also threatened NAR's ability to control competition in the residential real estate brokerage industry.

10. NAR-affiliated MLSs were aware of this competitive threat. Competing MLS systems met together privately and through NAR to discuss this threat and formulated a common plan to eliminate that competitive threat.

11. In September 2019, the largest NAR-affiliated MLSs, including California Regional Multiple Listing Service, Bright MLS, as well as Midwest Real Estate Data, jointly authored and published a white paper on pocket listings and the future of the NAR-affiliated MLS system. The white paper provided that "The multiple listing service as we know it is in jeopardy and this call-to-action serves as

an impassioned plea to brokers and MLSs to take immediate action." The white paper identified the declining share of properties listed in NAR-affiliated MLSs due to the "persistent, and increasing, presence of off-MLS home marketing" as among the "largest challenges MLSs face[.]" The white paper further noted the risk that one or more private listing networks would obtain a critical mass of pocket listings that "could fuel the trend to power private listing databases in general" which "will soon exceed, or circumvent, the service MLSs offer."

12. PLS was the listing network that NAR-affiliated MLSs feared. Having amassed nearly 20,000 members, PLS had or would have soon attracted a critical mass of members and listings to create a powerful network effect that was likely to quickly lead to substantial market share as new members joined, bringing new listings, attracting in turn more new members and more new listings in a virtuous and self-sustaining cycle. The more competitive future that the NAR-affiliated MLSs feared had arrived.

13. Acting through NAR, the NAR-affiliated MLSs moved swiftly to eliminate the competitive threat from listing networks aggregating pocket listings. In November 2019, NAR promulgated a mandatory rule governing all NAR-affiliated MLSs. The rule, called the Clear Cooperation Policy, requires NAR members participating in NAR-affiliated MLSs to submit their listings to the MLS within one business day of marketing the property to the public. For purposes of the Clear Cooperation Policy, NAR defines marketing a property to the public to include listing on private "multi-brokerage listing sharing networks" such as PLS. NAR members that violate the Clear Cooperation Policy face discipline and punishment by other NAR members.

14. The Clear Cooperation Policy eliminates the viability of the private network of pocket listings that the MLS conspirators and other NAR-affiliated MLSs had identified as a competitive threat. By eliminating the threat to NAR-affiliated

MLSs, NAR cements its ability to control competition in the market for residential real estate brokerage services.

15. Through the Clear Cooperation Policy, NAR and the MLS conspirators eliminated the possibility of a more competitive future in the market for residential real estate listing network services. A once-in-a-lifetime opportunity for competition in a monopolized market has been lost. NAR's conduct has harmed competition and consumers, and is illegal.

**PLAINTIFF**

16. Plaintiff PLS is a California Limited Liability Company headquartered in Los Angeles, California. At the time the Clear Cooperation Policy was adopted, PLS operated the largest network of licensed real estate professionals marketing pocket listings in the United States.

**DEFENDANT**

17. Defendant NAR is a trade association headquartered in Chicago, Illinois, that establishes and enforces policies and professional standards for its over 1.4 million members. NAR is incorporated under the laws of Illinois. Its 54 state and territorial associations and over 1,200 local associations are members of, and are overseen by, NAR. NAR promulgates rules governing the operation of the approximately 600 MLSs that are affiliated with NAR through their ownership or operation by NAR's state, local and territorial associations. NAR is registered to do business as a non-profit in the state of California and advertises and solicits members in the state. It has more than 185,000 members in California, derives revenue from California, and holds meetings in California. NAR also directs its California-based members to follow rules it promulgates.

**NON-PARTY CO-CONSPIRATORS**

18. California Regional Multiple Listing Service, Inc. ("CRMLS") is the largest MLS in the United States with over 100,000 members who have access to more than 70 percent of listings for sale in California. CRMLS is owned and

controlled by NAR members operating through 39 local associations of NAR throughout the State of California. CRMLS is headquartered in Chino Hills, California, and is incorporated under the laws of California. CRMLS is a NAR-affiliated MLS governed and controlled by NAR rules.

19. Bright MLS, Inc. ("Bright MLS") is a MLS serving the Mid-Atlantic region of the United States with over 88,000 members. Bright MLS is owned and controlled by NAR members operating through 43 local associations of NAR members operating through local associations of NAR throughout the States of New Jersey, Delaware, Maryland, Pennsylvania, West Virginia, the Commonwealth of Virginia, and the District of Columbia. Bright MLS is headquartered in Rockville, Maryland, and is incorporated under the laws of Delaware. In a typical year, Bright MLS will facilitate approximately $70 billion in residential real estate transactions. Bright MLS is a NAR-affiliated MLS governed and controlled by NAR rules.

20. Midwest Real Estate Data, LLC ("MRED") is a MLS serving northern Illinois, southern Wisconsin, and northwest Indiana with over 45,000 members. MRED is indirectly owned and controlled by NAR members operating through 15 local associations of NAR throughout the States of Illinois, Wisconsin, and Indiana. MRED is headquartered in Lisle, Illinois, and organized under the laws of Illinois.

## JURISDICTION, STANDING, AND VENUE

21. Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, arising from NAR's violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22. This Court has subject matter jurisdiction of Plaintiff's claim pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

23. Plaintiff has standing to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

24. This Court has personal jurisdiction over Defendant and venue is proper in the Central District of California and this division under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because NAR and CRMLS regularly transact business within the Central District of California, and because Bright MLS and MRED formulated, led and joined a conspiracy among NAR members and NAR-affiliated MLSs that expressly aimed their intentional and anticompetitive conduct at California. NAR and its co-conspirators knew and specifically intended that their conspiracy would be formulated, negotiated, and implemented in California, would exclude competition in California (where they knew PLS was based), and would harm consumers in California. NAR and its co-conspirators worked in concert to effect NAR's adoption of the Clear Cooperation Policy at a 2019 NAR Convention in California, and NAR and its co-conspirators committed overt acts in furtherance of the conspiracy in California. CRMLS, Bright MLS, and MRED (together, the "MLS Conspirators") were among the MLSs that caused the September 2019 white paper, setting forth the competitive threat from pocket listings and the need for collective action among NAR-affiliated MLSs, to be published from San Juan Capistrano, California.

25. NAR and the MLS Conspirators are engaged in, and their activities substantially affect, interstate trade and commerce. Billions of dollars flow across state lines in the mortgage market to finance the sales of residential real estate facilitated by NAR and the MLS Conspirators.

## RESIDENTIAL REAL ESTATE BROKERAGE

26. State law regulates entry into the residential real estate brokerage services industry. There are two licensee categories: (i) the real estate broker; and (ii) the individual real estate licensee or agent. Brokers supervise agents who work directly with consumers. Agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences. Brokers

often provide agents with branding, advertising, and other services that help the agents complete transactions.

27. Although there is no legal impediment to consumers buying and selling homes on their own, the large majority of consumers choose to work with a real estate broker. The substantial majority of residential real estate transactions involve the services of licensed real estate professionals. According to NAR, in 2017, 92 percent of sellers sold their home and 87 percent of buyers purchased their home with the assistance of a real estate broker.

28. The vast majority of licensed real estate professionals active in the residential real estate brokerage services industry are NAR members.

29. NAR promulgates rules and codes of conduct for its members and for its state, territorial and local associations. These associations, in turn, are required to adopt NAR's rules and bylaws and to enforce NAR-promulgated rules upon the licensed real estate professionals comprising the associations.

30. Until recently, with the surge in consumer demand for pocket listings, NAR-affiliated MLSs facilitated the vast majority of residential real estate transactions.

31. MLSs are joint ventures among virtually all licensed real estate professionals operating in local or regional areas. Licensed real estate professionals regard participation in their local MLS as critical to their ability to compete with other licensed real estate professionals for home sellers and buyers. The MLS combines its members' home listings information into a database, usually in electronic form. The MLS then makes these data available to all licensed real estate professionals who are members of the MLS. By listing in the MLS, a licensed real estate professional can market properties to a large set of potential buyers. By searching the MLS, a licensed real estate professional representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs. An MLS is thus a market-wide joint venture of competitors that possesses substantial market

power: to compete successfully, a licensed real estate professional must be a member; and to be a member, a licensed real estate professional must adhere to any restrictions that the MLS imposes.

32. The state, territorial and local associations of NAR (sometimes referred to as "Realtor® associations") own NAR-affiliated MLSs. NAR requires each of these associations to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy.

33. NAR does not require that licensed real estate professionals be NAR members to participate in NAR-affiliated MLSs. In Alabama, California, Florida, and Georgia, NAR-affiliated MLSs are prohibited by law from promulgating any such requirement. As a result, many licensed real estate professionals that are not NAR members participate in NAR-affiliated MLSs.

34. NAR-affiliated MLSs must adopt new or amended NAR policies. NAR's Handbook on Multiple Listing Policy states that NAR-affiliated MLSs "must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

35. One of the many benefits that NAR provides to its state, territorial and local associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these valuable insurance benefits from associations and MLSs that fail to comply with these mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

36. NAR reviews the governing documents of its state, territorial and local associations to ensure compliance with its rules. NAR requires its state, territorial and local associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## THE NAR-AFFILIATED MLS SYSTEM

37. For decades, the NAR-affiliated MLSs have often been regarded as a permanent, unavoidable, and inevitable feature of the residential real estate brokerage industry. NAR-affiliated MLSs have for decades enjoyed durably high market shares in markets across the country.

38. The majority of NAR-affiliated MLSs, including Bright MLS, are managed as for-profit enterprises. Regardless of their corporate form, the majority of NAR-affiliated MLSs, and MRED, serve directly or indirectly as the primary revenue stream for their owners, the state, territorial and local associations of NAR, whose shareholders use the funds for other purposes.

39. All NAR-affiliated MLSs are actual or potential competitors with other NAR-affiliated MLSs. NAR-affiliated MLSs frequently have overlapping service areas and licensed real estate professionals may choose to pay for access to only one of several available NAR-affiliated MLSs.

40. NAR-affiliated MLSs charge licensed real estate professionals for access to each MLS. The prices charged by NAR-affiliated MLSs to licensed real estate professionals for access to the MLS are excessive, above competitive levels, and unrelated to the MLSs' cost of service.

41. NAR-affiliated MLSs have been slow to innovate and unresponsive to consumer demand. According to NAR-affiliated MLSs writing in 2019, "the software used in most MLSs has become obsolete."

42. According to a white paper commissioned by NAR-affiliated MLSs in 2017, "Almost everyone interviewed for this study feels that the MLS industry has meandered aimlessly for over a decade. There are of course various reasons, but the

dominant contributing factor is the fact that most MLS organizations are owned and governed by Realtor® associations. And Realtor® associations, and their fragmentally managed committee structure, are simply not geared to compete in today's new, bold, fast-paced technology arena."

43. A Chief Executive Officer of one NAR-affiliated MLS stated in 2017, "As an industry, we have outdated technology that is the result of the community we represent resisting change. There are perhaps 30 to 40 MLSs across the country that have it right or are moving toward the right direction, but there are also 650 MLS organizations that are continuing to rest on how they have done it for decades. They are ignoring the fact that the marketplace and the needs of the user have changed, and their failure to respond is spiraling the MLS industry to the bottom."

44. Another Chief Executive Officer of a NAR-affiliated MLS stated in 2017, "The MLS has a business model problem. The industry has forgotten who their customers are. The industry's longstanding 'product in a box' solution is no longer valid and the platform it is delivered on is antiquated. In essence, the MLS is still trying to operate as a gatekeeper and continues to block real estate professionals from having access to the best-in-class products they need to help them do their job."

45. The regionally-fragmented system of NAR-affiliated MLSs is inefficient and imposes unnecessary and redundant costs on licensed real estate professionals. According to an executive of a large real estate brokerage in 2017, "Mid-sized and large brokerages that operate across states and regions face unique challenges in having to belong to multiple MLSs, and that can be costly, redundant and inefficient." According to a 2015 study commissioned by NAR, "An estimated $250-$500 million in MLS fees are attributable to duplication, redundancy, and excess among MLSs every year. If economies of scale were implemented nationwide, MLS fees would be significantly less."

46. There is consumer demand for a listing network aggregating listings nationwide. According to a 2015 study commissioned by NAR, "A national MLS has

been talked about for decades, but never before has the likelihood of it actually becoming a reality been so high."

47. One driver of consumer demand for a national listing network service is attributable to large brokerages, which purchase listing network services nationwide. These brokerages can belong to dozens of MLSs across the country with often different rules, policies, technology and underlying systems. In 2013, dozens of large brokerages threatened to pull out of NAR-affiliated MLSs and create their own multi-brokerage listing network, voicing concerns about MLSs overcharging for MLS services.

48. Another driver of consumer demand for a national listing network service is attributable to brokerages that specialize in serving clients interested in listing properties that may be of interest to buyers nationwide, clients interested in considering the purchase of properties nationwide, or both. These properties are sometimes relatively unique and have high listing prices.

**POCKET LISTINGS CREATE THE OPPORTUNITY FOR COMPETITION**

49. MLSs, like other networks, exhibit what economists call "network externalities," meaning the value of the network services is a function of the number of trading partners connected by the network.

50. The dominance of NAR-affiliated MLSs is a function of the percentage share of listings submitted to NAR-affiliated MLSs by licensed real estate professionals. When all or almost all listings are submitted to the NAR-affiliated MLSs, the possibility of effective competition to those MLSs is nil. Conversely, when listings are not submitted to the MLS and are marketed by licensed real estate professionals in other ways, the possibility of competition to the MLSs emerges. And when a critical mass of listings becomes available for a competing listing network, the possibility of head-to-head, network-to-network competition becomes real.

51. The dominance of NAR-affiliated MLSs is neither inevitable nor efficient. The surge in consumer demand for pocket listings created, for the first time

in living memory, the possibility of competition for the NAR-affiliated MLSs. Pocket listings presented the opportunity for a competing listing network to aggregate a critical mass of listings that could support a listing network competing with the NAR-affiliated MLSs.

52. According to a 2015 study commissioned by NAR, "Off-MLS listings may contribute to the unraveling of the MLS as we know it, and its replacement by a private network that serves to benefit a certain group of participants."

53. There is substantial and unmet demand among licensed real estate professionals, and among the customers they serve, for an alternative to the NAR-affiliated MLSs.

54. According to a 2015 study commissioned by NAR, "A number of industry initiatives suggest that the current MLS-centric era might be coming to an end. After half a century of operating as the only gateway, there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."

55. According to the President and Chief Executive Officer of a network of large real estate brokerage firms in 2017, "MLS has been of great value to agents, but their loyalty to the MLS is waning … For the first time, the industry has entered a world where there are realistic and legitimate attempts to create alternatives to the MLS that exists today."

56. As one licensed real estate professional wrote after the NAR Clear Cooperation Policy was adopted, "I long for the day when a private company decides to create an MLS platform that competes with association-owned MLSs freeing us from the clutches of NAR."

**PLS WAS A COMPETITIVE THREAT TO NAR'S MLS SYSTEM**

57. PLS was formed in 2017 to address the demand of licensed real estate professionals, and for the consumers they serve, for an alternative to the NAR-affiliated MLS system.

58. Like the NAR-affiliated MLSs, PLS is a private network limited to licensed real estate professionals. All licensed real estate professionals were eligible to be members in the PLS.

59. The PLS, like the NAR-affiliated MLSs, is a means for licensed real estate professionals to cooperate in the sale of residential real estate. Like the NAR-affiliated MLSs, PLS operates an electronic database of listings submitted by PLS members with an offer of compensation to other PLS members that can find a buyer. Like the NAR-affiliated MLSs, PLS then makes these data available to all licensed real estate professionals who are members of the PLS.

60. Unlike the NAR-affiliated MLSs, licensed real estate professionals listing on PLS could share as much or as little information about the listing as their client desired. In this way, the PLS combined the powerful network efficiencies of the MLS with the privacy and discretion of the pocket listing.

61. Before PLS was launched, there was no place for licensed real estate professionals operating in separate brokerage firms to privately list, search, organize and share information about pocket listings.

62. PLS's fees to licensed real estate professionals would have been substantially lower than the fees charged for similar services to licensed real estate professionals by the NAR-affiliated MLSs.

63. PLS was designed and marketed as a national platform, unlike the fragmented NAR-affiliated MLS system that imposes duplicative and burdensome fees on brokerages operating in multiple geographic markets.

64. PLS was an actual or potential competitor to every single NAR-affiliated MLS, and each MLS Conspirator. At the time the Clear Cooperation Policy was adopted, PLS had members across the country, including in the service areas of the MLS Conspirators.

65. PLS launched successfully and grew quickly. At the time the Clear Cooperation Policy was adopted, nearly 20,000 licensed real estate professionals were cooperating to sell billions of dollars of residential real estate listings nationwide.

66. PLS was a serious competitive threat to the NAR-affiliated MLS system, and to the MLS Conspirators.

67. NAR and the NAR-affiliated MLSs, and the MLS Conspirators, were aware of this competitive threat and acted through the Clear Cooperation Policy and otherwise to eliminate this threat.

**NAR AND ITS AFFILIATES EXCLUDE COMPETITION**

68. For the NAR-affiliated MLSs, pocket listings are a form of lost market share. The NAR-affiliated MLSs were concerned that a critical mass of pocket listings could be aggregated in a competing listing network, making possible for the first time network-to-network competition to the MLS system.

69. NAR-affiliated MLSs, and MRED, recognized that they could not unilaterally eliminate the competitive threat that pocket listings posed, in part because pocket listings are a national phenomenon and could create the possibility of a nationwide competitor to the MLS system. NAR-affiliated MLSs, and MRED, recognized the need for collective action among NAR-affiliated MLSs, in the form of a change to the mandatory provisions in NAR's Handbook on Multiple Listing Policy that would require all NAR-affiliated MLSs to take action to stamp out the possibility of competitive entry presented by the rise of pocket listings.

70. In August 2019, NAR's MLS Technology and Emerging Issues Advisory Board voted to recommend the adoption of what would become the Clear Cooperation Policy at the upcoming NAR Convention in San Francisco, California. The members present for this vote included executives of NAR-affiliated MLSs, and Defendant MRED. On information and belief, MRED's representative participated in this NAR Advisory Board meeting as a representative of the Council of Multiple

Listing Services ("CMLS"), an association of approximately 200 MLSs, including NAR-affiliated MLSs and the MLS Conspirators.

71. NAR admits that the Clear Cooperation Policy was formulated and advanced by the NAR-affiliated MLSs, and by MRED. According to NAR, "The association's MLS Technology and Emerging Issues Advisory Board, a group made up of brokers and MLS executives, developed the proposal in consultation with brokerage and MLS leaders across the industry."

72. NAR-affiliated MLSs around the country communicate frequently and privately among themselves regarding pocket listings, using internet forums and social media, and through CMLS.

73. MRED's Chief Executive Officer admits that these private interfirm communications among NAR-affiliated MLSs, MRED, and the other MLS Conspirators, were the means by which the Clear Cooperation Policy was formulated and advanced.

74. In September 2019, Bright MLS, MRED, and CRMLS were among the signatories of the white paper issued by the largest NAR-affiliated MLSs that called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate such listings.

75. On October 16, 2019, Bright MLS adopted a version of what would become the Clear Cooperation Policy, before having any obligation under NAR rules or otherwise to do so.

76. On or around the same day, MRED published a statement supporting adoption by NAR of the Clear Cooperation Policy at the upcoming NAR Convention.

77. On October 17 and 18, 2019, NAR-affiliated MLSs, MRED, and the other MLS Conspirators, met at a CMLS conference in Salt Lake City, Utah to discuss the competitive threat presented by pocket listings and the need for NAR to take

action at the upcoming NAR Convention to eliminate that threat through adoption of the Clear Cooperation Policy.

78. On October 17, 2019, the Chief Executive Office of MRED addressed the assembled representatives of the NAR-affiliated MLSs at the CMLS conference. MRED's Chief Executive Officer, who had attended the August NAR meeting where the Clear Cooperation Policy was first proposed and recommended, explained that the Clear Cooperation Policy was motivated by concerns that pocket listings were "making the MLS less valuable." At this October 2019 CMLS conference, representatives of the assembled NAR-affiliated MLSs were provided with copies of MRED's published statement in support of the Clear Cooperation Policy and urged to review it.

79. On October 17, 2019, the Chairman of Bright MLS addressed representatives of the NAR-affiliated MLSs at the CMLS conference, recited the fact that Bright MLS the day before had adopted a policy banning pocket listings, and urged the assembled NAR-affiliated MLSs to adopt similar policies. The Chairman of Bright MLS also urged the representatives of the NAR-affiliated MLSs to attend the upcoming NAR Convention, and to work as a group at that meeting to ensure NAR's adoption of the Clear Cooperation Policy.

80. Among other things, the Chairman of Bright MLS stated "Now, the people who want to do pocket listings? They're a little pissed. They'll get over it. We need to not worry about it. Because that's bad for our industry, right? All right, let me tell you what we all need to do. We have an opportunity in front of us to make, put this policy into effect in November. And Bright adopted it yesterday, MRED's already adopted it, other people are already doing it, but we really need to get it through."

81. The Chairman of Bright MLS continued on: "So what do we need to do? We need to go back and talk to your Boards of Directors, talk to your big brokers, and make sure that they understand we're talking pocket listings and not everything else

and make sure that they understand. And then you need to make a policy statement. What are you guys going to do? And then you need to come to that MLS forum, and you need to line up at the microphone and say 'Bright MLS, we're all in. 8.0. Go.'" What would become the Clear Cooperation Policy was referred to at this time as MLS Statement 8.0.

82. The Chairman of Bright MLS explained to the representatives of the assembled NAR-affiliated MLSs that he anticipated a degree of resistance to passage of the Clear Cooperation Policy at the upcoming NAR Convention, in part from NAR members who wished to continue to offer pocket listings.

83. The Chairman of Bright MLS urged the representatives of the assembled MLSs to contact members of their MLS who were on NAR's Board of Directors to advocate for the adoption of the Clear Cooperation Policy at the upcoming NAR Convention.

84. The Chairman of Bright MLS urged the representatives of the assembled NAR-affiliated MLSs to take collective action in the State of California to effect the adoption of the Clear Cooperation Policy. Specifically, the Chairman of Bright MLS said "I look forward to seeing you in San Francisco. I look forward to us, in this room, getting this through."

85. In November 2019, NAR's and the MLS Conspirators gathered in San Francisco to take action on the Clear Cooperation Policy. On November 9, 2019, NAR's Multiple Listing Issues and Policies Committee approved the Clear Cooperation Policy by a voice vote, sending the Policy to NAR's Board of Directors. Executives of the NAR-affiliated MLSs, including Bright MLS, and MRED, attended this meeting and spoke in support of the Clear Cooperation Policy. As had been discussed and planned at the October CMLS conference, other NAR-affiliated MLSs did the same. At this meeting, elimination of competition to NAR-affiliated MLSs from networks aggregating pocket listings was cited as a reason for passage of the Clear Cooperation Policy.

86. NAR's Executive Committee reviewed and discussed the Clear Cooperation Policy at the San Francisco meeting on November 10, 2019. NAR's Board of Directors approved the Clear Cooperation Policy at the San Francisco meeting on November 11, 2019.

87. NAR adopted the Clear Cooperation Policy over the complaints of some NAR members, who informed NAR that the policy was anticompetitive and likely illegal.

88. The text of the Clear Cooperation Policy provides:

> Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. (Adopted 11/19).

89. The Clear Cooperation Policy was effective January 1, 2020, and was included as a mandatory rule in the 2020 version of the NAR Handbook on Multiple Listing Policy. NAR required that all NAR-affiliated MLSs, including Bright MLS and CRMLS, modify their rules to conform to the Clear Cooperation Policy by May 1, 2020. NAR admits that all NAR-affiliated MLSs, including Bright MLS and CRMLS, must adopt and enforce the Clear Cooperation Policy. According to NAR, "By establishing a national policy, it is mandatory that all REALTOR® Association MLSs adopt the policy and have the same consistent standard."

90. NAR admits that there are no exceptions for properties that are "publicly marketed." According to NAR, "The new policy does not include an 'opt out.' Any listing that is 'publicly marketed' must be filed with the service and provided to other MLS Participants for cooperation within (1) one business day."

91. Previously, NAR-affiliated MLSs had generally allowed members to withhold listings from the MLS if the seller of the property so desired. The Clear

Cooperation Policy eliminates this possibility, and in that way renders the provision of residential real estate brokerage services unresponsive to consumer demand.

92. The Clear Cooperation Policy does, however, have an exception that allows brokerages to maintain so-called "office listings," or listings marketed entirely within a brokerage firm, without submission of those listing to the MLS.

93. NAR-affiliated MLSs, including Bright MLS and CRMLS, enforce the Clear Cooperation Policy by monitoring adherence to the policy, encouraging MLS members to report their colleagues using pocket listings, and through fines for non-compliance. For example, one MLS in South Florida, a market where consumer demand for pocket listings is high, describes the penalties it levies for violations of the Clear Cooperation Policy as "severe," including maximum fines of up to $15,000 and possible suspension or termination of access to the MLS. The penalties imposed by the NAR-affiliated MLSs for violations of the Clear Cooperation Policy are intended to, and in fact do, make violations of the Clear Cooperation Policy cost-prohibitive for NAR members, and are a constructive refusal to offer MLS services to NAR members that violate the Clear Cooperation Policy.

94. Since the adoption of the Clear Cooperation Policy, NAR-affiliated MLSs have operated, or planned to operate, their own private listing networks, effectively allowing their members to market off-MLS listings under the auspices of the NAR-affiliated MLSs without violation of the Clear Cooperation Rule. MRED has also operated a private listing network.

95. NAR-affiliated MLSs and CMLS have admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS.

## RELEVANT MARKET

96. PLS and the NAR-affiliated MLSs, including Bright MLS and CRMLS, and MRED, compete to offer listing networks that facilitate the sale of residential real estate listings among licensed residential real estate professionals in the United States.

97. The provision of listing network services to licensed real estate professionals for the sale of residential real estate listings is a relevant antitrust market. Consumers of listing network services for the sale of residential real estate listings view these networks, including the NAR-affiliated MLSs, MRED and PLS, as substitutes for each other. A hypothetical monopolist of listing network services for the sale of residential real estate listings could profitably impose a small but significant, non-transitory increase in price above competitive levels.

98. Listing network services are not a two-sided transaction market because listing networks do not involve a simultaneous sale between buyers and sellers of real estate. No transaction between buyers and sellers occurs on these networks. The networks simply list available residential real estate for sale and charges brokerages monthly fees to access the network, regardless of whether their agents represent buyers, sellers, or both. Access to the listing network gives real estate agents the ability to list properties for sale or view available properties for sale.

99. One relevant geographic market is nationwide. Licensed real estate professionals and their customers seek listing network services that aggregate listings nationwide, from across the United States. In the alternative, each and every service area of a NAR-affiliated MLS, as well as the service areas of each MLS Conspirator, is a relevant geographic market. On information and belief, each of the MLS Conspirators has enjoyed a durably high share of over 65 percent of residential real estate listings marketed by licensed real estate professionals in their respective service areas.

100. NAR and the MLS Conspirators collectively have substantial market power in the relevant market or markets, however defined. Substantial barriers to entry exist to protect that market power, as shown by the durably high market shares enjoyed by the NAR-affiliated MLSs and NAR's ability to exclude competition. One substantial barrier to entry are the network effects that accrue to the NAR-affiliated MLSs as a result of their large market shares. The value of an MLS to licensed real

estate professionals is a function of its market share. The greater the market share, the larger the network effects that accrue to the MLS, and the more important access to the MLS is to licensed real estate professionals. NAR and NAR-affiliated MLSs, including the MLS Conspirators, have the power to profitably elevate the prices paid by licensed real estate professionals for access to listing network services above the competitive level, and to impose onerous conditions of access on licensed real estate professionals, including the Clear Cooperation Policy.

## NAR'S UNLAWFUL CONDUCT

101. NAR and the MLS Conspirators agreed with one another to exclude PLS. NAR and the MLS Conspirators had a conscious commitment to a common scheme to prevent the emergence of a viable competitor to NAR-affiliated MLSs, to exclude PLS from the relevant market, and to eliminate PLS as an effective competitor. NAR and the MLS Conspirators took overt acts in furtherance of this conspiracy.

102. NAR is a combination or conspiracy among its members, who are licensed real estate professionals who compete with one another. The members of NAR, as a group and through the Board they elect and the staff they indirectly employ, have agreed to, adopted, maintained, and enforced rules, including the Clear Cooperation Policy, affecting how members compete to provide brokerage services, participate in NAR-affiliated MLSs, and access MLS services. NAR's members agree (and adhere) to NAR's code of ethics, bylaws, and rules as a condition of membership. NAR's rules, including the Clear Cooperation Policy, are therefore the product of agreements and concerted action among its members, including the owners of the NAR-affiliated MLSs. that operate and control the MLS Conspirators.

103. The adoption and enforcement of the Clear Cooperation Policy by the NAR-affiliated MLSs is also the product of agreements and concerted action (i) among the MLS Conspirators and (ii) between and among each NAR-affiliated MLS and their members. Each NAR-affiliated MLS is owned and controlled by associations of competing real estate brokers, who collectively have the power to

admit new members, propose bylaws, and enact rules for members. The NAR-affiliated MLSs' rules are an agreement among competitors that define the way in which they will compete with one another.

104. The Clear Cooperation Policy and the overt acts taken by NAR and NAR-affiliated MLSs in formulating, adopting, implementing, and enforcing that Policy, are unreasonable restraints of trade. Each of the MLS Conspirators joined the conspiracy to formulate and adopt the Clear Cooperation Policy for their own financial benefit and to eliminate the threat posed by upstart networks such as the PLS, and took overt acts in furtherance of that conspiracy.

105. The Clear Cooperation Policy imposes an "all or nothing" term on licensed real estate professionals that seek to use listing networks: the licensed real estate professional must either submit all such listings to the NAR-affiliated MLSs, or risk losing access to the NAR-affiliated MLSs.

106. The "all or nothing" term imposed on licensed real estate professionals by the Clear Cooperation Policy is exclusionary.

107. Because licensed real estate professionals generally believe that they must submit at least a portion of their listings to NAR-affiliated MLSs to serve their customers, the Clear Cooperation Policy predictably ensures that all listings are submitted to NAR-affiliated MLSs.

108. By ensuring that all listings are submitted to NAR-affiliated MLSs, the Clear Cooperation Policy eliminates the ability of listing networks that compete with the NAR-affiliated MLSs to feature listings that are not on the NAR-affiliated MLSs, and ensures that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network.

109. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy degrades the quality of competing listing networks, reduces the incentives of licensed real estate

professionals to use those competing listing networks, and makes those competing listing networks less effective competitors to the NAR-affiliated MLSs.

110. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy imposes a penalty on the use of competing listing networks and creates strong economic incentives for licensed real estate professionals to purchase listing network services exclusively from NAR-affiliated MLSs. By ensuring that licensed real estate professionals accessing listings through a competing listing network pay twice for access to the same listings, the Clear Cooperation Policy creates strong economic incentives for licensed real estate professionals to exclusively use NAR-affiliated MLSs to avoid the surcharge imposed by the Clear Cooperation Policy on the use of competing listing networks.

111. The Clear Cooperation Policy has had actual and substantial anticompetitive effects by eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS, or any other listing network, thereby harming competition in the market for the provision of listing network services to licensed real estate professionals.

112. By eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS or any other listing network, the Clear Cooperation Policy forecloses competing listing networks from access to a critical mass of listings necessary to obtain significant network effects and compete with the NAR-affiliated MLSs in the relevant market(s). All or nearly all active licensed real estate professionals depend upon access to NAR-affiliated MLSs.

113. Through the Clear Cooperation Policy, NAR and the NAR-affiliated MLSs maintained the cost of listing network services for residential real estate listings above a competitive level, and otherwise stifled competition in the market for listing network services for residential real estate listings. In that way, the conduct of NAR and the MLS Conspirators harmed (i) real estate professionals serving both buyers

and sellers of residential real estate services that desired to use listing networks other than those operated by the NAR-affiliated MLSs, and also (ii) those buyers and sellers of residential real estate.

114. The Clear Cooperation Policy also harmed consumers and competition by eliminating from the market a form of real estate brokerage services desired by consumers, and which lowered barriers to entry for listing networks competing with the NAR-affiliated MLSs and MRED. There was substantial consumer demand for pocket listings. Before the Clear Cooperation Policy, licensed real estate professionals, including but not limited to NAR members, competed to offer pocket listings, and listing networks that competed with the NAR-affiliated MLSs and MRED were formed. Through the Clear Cooperation Policy, NAR restrained the ability of licensed real estate professionals to offer those services. Because NAR and its members collectively have market power, NAR's restraint on the ability of licensed real estate professionals to offer pocket listings has excluded competition in the relevant market(s), restricted output of residential real estate brokerage services and rendered the provision of those services unresponsive to consumer demand.

115. There is no cognizable or plausible procompetitive justification for the unlawful conduct of NAR and the MLS Conspirators, or one that outweighs its anticompetitive effects. NAR's tolerance of off-MLS listings when privately marketed by NAR members that do not compete with the NAR-affiliated MLSs as listing networks (the "office listing" exclusion) or under the auspices of NAR-affiliated MLSs shows that NAR's asserted justifications for the Clear Cooperation Policy are pretext, and illuminate the purpose and effect of the Clear Cooperation Policy as the elimination of competition to the NAR-affiliated MLSs in the relevant market(s) from PLS and other listing networks not affiliated with NAR.

116. For nearly 60 years, NAR's Bylaws have recognized that forcing NAR members to list properties in the MLS in the routine provision of real estate brokerage services is improper and not reasonably related to any legitimate business

Case 5:26-mc-00525 Document 1 Filed 10/21/26 Page 26 of 31

justification. Since 1960, Interpretation No. 1 of Article 1, Section 2 of NAR's Bylaws has provided that "A requirement to participate in a Multiple Listing Service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership. When a Multiple Listing Service is available, is well operated and properly organized, it is the duty of the REALTOR® to consider thoroughly whether he can serve the best interests of his clients by participating in it. The decision, however, must be his own. As a REALTOR®, it is possible for him to conduct business in an ethical and efficient manner without participating in a Multiple Listing Service. Therefore, his participation must not be a requirement of REALTOR® membership."

117. According to NAR's Handbook on Multiple Listing Policy, "Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership."

118. The Clear Cooperation Policy does not eliminate or prevent any free-riding at the expense of NAR, NAR members, or the NAR-affiliated MLSs. NAR does not itself provide MLS services. NAR can and does charge membership fees, and can and does recoup the costs of providing its services in those fees. The NAR-affiliated MLSs charge a membership fee for access to their listing networks, and can and do recoup the costs of providing listing network services in those fees. The membership fees charged by the NAR-affiliated MLS do not generally vary depending on the number of listings submitted by NAR members to the MLS. PLS members that sought to list properties on the PLS while also accessing a NAR-affiliated MLS were not free-riding on NAR members that only submit listings to NAR-affiliated MLS because PLS members that continued to also access the NAR-affiliated MLS continued to pay fees to the NAR-affiliated MLSs. There were no

uncompensated services being provided by NAR, NAR members or NAR-affiliated MLSs to members of the PLS. Instead, NAR and the MLS Conspirators advocated for and/or adopted the Clear Cooperation Policy as a means of preventing the continued exponential growth of a competitor that was providing a lower cost and nationwide listing service.

119. The Clear Cooperation Policy is also overbroad and restrains competition unnecessarily. The Clear Cooperation Policy was passed by NAR members but limits the ability of licensed real estate professionals who are not NAR members to compete using alternative listing network services because even non-NAR members generally depend upon access to the NAR-affiliated MLSs for at least some of their business. NAR has no legitimate business justification for using NAR rules to restrain the ability of non-NAR members to deal with PLS and other listing networks that compete with the NAR-affiliated MLSs. The overbreadth of the Clear Cooperation Policy illuminates its anticompetitive purpose and effect.

120. PLS suffered injury and damages as a result of the unlawful conduct of NAR and the MLS Conspirators. Adoption and implementation of the Clear Cooperation Policy had the natural and intended effect on PLS's business operations. Listings were removed from PLS and submitted instead to NAR-affiliated MLSs. Agent participation in PLS declined. PLS's access to capital was constrained. PLS was foreclosed from the commercial opportunities necessary to innovate and grow.

121. Injury to PLS was the direct, foreseeable and intended result of NAR and MLS Conspirators' conduct. The conduct of NAR and the MLS Conspirators simultaneously harmed PLS and consumers in the relevant market by excluding PLS and thereby artificially maintaining or increasing the prices paid by licensed real estate professionals for listing network services for the sale of residential real estate. Although the mechanism of injury to PLS and to licensed real estate professionals (and thereby to consumers) is the same, the damages caused by conduct of NAR and the MLS Conspirators in the form of higher prices is distinct from, and not duplicative

of, the damages caused to PLS, which take the form of lost profits and damaged equity and goodwill.

**UPDATED FACTUAL ALLEGATIONS**

122. PLS filed a Complaint in this Court in May 2020 naming as defendants NAR and the MLS Conspirators. *See The PLS.com, LLC v. The National Association of Realtors et al*, Case No. 2:20-cv-04790 ("*PLS I*"), ECF 1. PLS filed an Amended Complaint in July 2020. *Id.*, ECF 46. The Amended Complaint was dismissed with prejudice for failure to state a claim upon which relief could be granted in February 2021. *Id.*, ECF 97. The Ninth Circuit reversed, holding that PLS's Amended Complaint stated a claim for relief under Section 1 of the Sherman Act. *PLS.Com, LLC v. National Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022).

123. On January 25, 2024, NAR and PLS entered into a Tolling Agreement and Stipulation. The Tolling Agreement and Stipulation, among other things, tolled any applicable statutes of limitations for PLS's claims against NAR from May 28, 2020, through the termination of the Tolling Agreement and Stipulation. The Tolling Agreement and Stipulation had an expiration date of December 31, 2024. A true and correct copy of the Tolling Agreement and Stipulation is attached hereto as Exhibit A.

124. On January 26, 2024, PLS dismissed its claims against NAR without prejudice. *See PLS I*, ECF 179.

125. On February 2, 2024, PLS dismissed its claims against the MLS Conspirators with prejudice. *See PLS I*, ECF 180.

126. On March 14, 2025, but effective as of December 31, 2024, NAR and PLS entered into an Amendment to the Tolling Agreement and Stipulation. The Amendment to the Tolling Agreement and Stipulation, among other things, tolled any applicable statutes of limitations for PLS's claims against NAR from May 28, 2020 until June 30, 2025, unless earlier terminated by the parties. A true and correct copy

of the Amendment to the Tolling Agreement and Stipulation is attached hereto as Exhibit B.

127. Paragraphs 1-121 of this Complaint are substantively identical to the Amended Complaint filed by PLS in July 2020 (*PLS I*, ECF 46), with the omission of the MLS Conspirators as defendants and non-substantive changes to reflect that omission.

128. NAR's Clear Cooperation Policy remains in effect as alleged herein and continues to have anticompetitive effects as alleged herein.

129. NAR's Clear Cooperation Policy continued to have its natural and intended effect on PLS's business operations through August 2024, when PLS discontinued the provision of listing network services and exited the relevant market. At all relevant times, the Clear Cooperation Policy materially impaired PLS's business operations by preventing it from attracting a critical mass of listings sufficient to compete effectively in the relevant market for listing network services for the sale of residential real estate listings. The Clear Cooperation Policy had a direct, material and adverse effect on PLS's business operations through August 2024 including diminished profits and diminished enterprise value and was throughout that time a material cause of injury to PLS's business and property. PLS exited the relevant market as a direct result of the anticompetitive effects of the Clear Cooperation Policy.

**PLS'S CLAIM FOR RELIEF**

**COUNT ONE**

**(Violation of the Sherman Act)**

130. PLS hereby restates Paragraphs 1 through 129 of this Complaint. NAR's conduct as alleged herein is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131. NAR's conduct has caused injury and damage to PLS in the form of lost profits.

132. NAR's conduct has caused injury and damage to PLS in the form of lost enterprise value, equity and goodwill, diminishing the value of PLS as a going concern.

## PRAYER FOR RELIEF

WHEREFORE, PLS respectfully prays for relief and judgment against NAR as follows:

1. Award compensatory and trebled damages in favor of PLS and against NAR, including all interest thereon;

2. Award PLS reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

3. Any other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: July 1, 2025

By: */s/ Christopher G. Renner*

Christopher G. Renner*
cgrenner@dhillonlaw.com
D.C. Bar No. 1025699
(571) 430-2240 (voice and fax)
Jonathan M. Shaw*
jshaw@dhillonlaw.com
Virginia Bar No. 98497
(703) 748-2266 (voice and fax)
Andrew K. Mann*
akmann@dhillonlaw.com
Virginia Bar No. 77021
(571) 695-2677 (voice and fax)
Domenic P. Aulisi*
daulisi@dhillonlaw.com
Virginia Bar No. 101045
(703) 574-1093 (voice and fax)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

* *pro hac vice* forthcoming

By: */s/ Brandon Q. Tran*

Brandon Q. Tran
CA Bar No. 223435
btran@dhillonlaw.com
(949) 340-1968 (voice and fax)
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

***Attorneys for Plaintiff* The PLS.com, LLC**

# EXHIBIT A

## TOLLING AGREEMENT and STIPULATION

This **TOLLING AGREEMENT AND STIPULATION** (the " **Agreement**") is effective as of this 25th day of January, 2024, by and between The PLS.com, LLC (**"PLS"**), and The National Association of Realtors (**"NAR"**). PLS and NAR may be referred to herein singularly as "**Party**" or collectively as the "**Parties**".

**WHEREAS,** on May 28, 2020, PLS filed a Complaint against NAR and three multiple listing service defendants, in the United States District Court for the Central District of California – Western Division, Case No. 2:20-CV-04790 (the "**Lawsuit**"); and

**WHEREAS,** the PLS has reached a settlement agreement with the three multiple listing service defendants in the Lawsuit, which will result in a dismissal of the Lawsuit against those defendants; and

**WHEREAS,** PLS is prepared to dismiss without prejudice the Lawsuit against NAR so that the parties may explore the potential for a resolution of the claims alleged in the Lawsuit, based upon NAR's willingness to provide an agreement tolling of any applicable statutes of limitations; and

**WHEREAS,** the Parties have decided and agreed to execute this Agreement setting forth the terms of their agreement for dismissal of the Lawsuit without prejudice, and for the tolling of any limitations periods under state or federal law.

**NOW, THEREFORE, IT IS FURTHER AGREED** as follows:

1. **Tolling Agreement.**

1.1 The parties agree that the running of any limitations periods under any applicable state or federal statute of limitations or administrative filing deadline, or other

time-related defense, under common law or by statute, with respect to the claims asserted by PLS against NAR in the Lawsuit, are tolled from May 28, 2020 until the termination of this Agreement.

1.2 The tolling of limitations periods under this Agreement shall remain in effect commencing on May 28, 2020 and continue until the date on which PLS initiates a future lawsuit against NAR over the matters alleged in the Lawsuit, or the date upon which PLS and NAR execute a settlement resolving the claims alleged in the Lawsuit. Provided, however, that this Agreement terminates on its own terms on December 31, 2024.

1.3 Upon termination of this Tolling Agreement, all applicable time periods, other time-related defenses or equitable doctrines otherwise tolled by this Tolling Agreement shall again commence running.

1.4 PLS agrees that NAR is not waiving any defense otherwise available to it, including, without limitation, lack of jurisdiction, exhaustion of remedies, and statutes of limitations with respect to any limitations period that existed as of May 28, 2020, or that may expire after the termination of this Agreement.

1.5 Nothing in this Agreement shall revive or be asserted to revive any claim, action, suit, demand, cross-demand, or defense that is or would be barred due to the passage of time prior to May 28, 2020 and/or after the termination of this Agreement.

1.6 The parties agreement to toll the limitations periods under this Agreement shall not be construed or deemed an admission adverse to any Party hereto: (i) of liability to any person and/or entity; (ii) of the commission of any act or wrong which was or could have been alleged in any action; (iii) of violation of any law or regulation; or (iv) that either

Party had a timely claim which is not time-barred or that it/he has complied with administrative requirements or any applicable statute of limitations or repose, or any similar rule of law including rules of eligibility. No Party has waived, or has intended to waive, any of its rights or defenses with respect to any actions, except as expressly provided in this Agreement. The Parties agree that they will not argue or contend that this Agreement is an admission or concession of any kind by the other Party.

**2. Dismissal of Lawsuit.**

The Parties agree that within 2 days of execution of this Agreement that their counsel will file a request for dismissal, without prejudice and without costs and disbursements to any party, of the claims against NAR. The Parties agree that their counsel are authorized to execute all documents necessary to achieve this dismissal without prejudice.

**3. Miscellaneous.**

3.1 This Agreement shall be binding upon, and inure to the benefit of, the Parties and their successors, predecessors, assigns, agents, representatives, heirs, and executors.

3.2 This Agreement shall be interpreted in accordance with the substantive law of the State of California, without application of choice of law rules. Each Party agrees that it will not assert or argue that any aspect of this Agreement is relevant to or otherwise affects which state's law does or does not apply to any claim, defense, or counterclaim.

3.3 This Agreement is non-transferable and can be modified only in a subsequent written agreement duly executed by each of the Parties to this Agreement. This Agreement shall constitute the entire understanding between the Parties concerning

the subject matter of this Agreement and supersedes and replaces all prior negotiations, proposed agreements, and agreements, written or oral, relating to this subject.

3.4 This Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed to be an original. Such counterparts shall together constitute, and be, one and the same instrument. Signatures transmitted by electronic mail or facsimile shall be acceptable for all purposes with respect to this Tolling Agreement.

3.5 All of the signatories represent and warrant that they have full approval to execute this agreement on behalf of the party they purport to sign for below.

**The PLS.com, LLC**

DocuSigned by:

By: ______________________

Chris Dyson
Founder and CEO
6300 Wilshire Blvd., Suite 2030
Los Angeles, CA 90048
chris@thenls.com

Date: 1/25/2024

**The National Association of Realtors**

DocuSigned by:

By: Ethan Glass

Ethan Glass
Cooley LLP
1299 Pennsylvania Ave, NW
Suite 700
Washington, DC 20004
Attorney for NAR

Date: 1/25/2024

# C

MASSEY & GAIL LLP
Matthew M. Collette (California Bar No. 138771)
Chiseul "Kylie" Kim
Matthew E. Layden
1000 Maine Ave. SW., Suite 450
Washington, D.C. 20024
Tel: (202) 652-4511
kkim@masseygail.com
mlayden@massygail.com

Leonard A. Gail
50 E. Washington St., Suite 400
Chicago, IL 60602
Tel: (312) 283-1590
lgail@masseygail.com

*Attorney for the National Association of* REALTORS®

HIRSCHFELD KRAEMER LLP
Daniel H. Handman
1299 Ocean Avenue, Suite 750
Santa Monica, CA 90401
Telephone: (310) 255-0705
dhandman@hkemploymentlaw.com

***Local Counsel for the National Association of* REALTORS®**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| The PLS.com, LLC, a California limited company,<br><br>Plaintiff,<br><br>vs.<br><br>THE NATIONAL ASSOCIATION OF REALTORS,<br><br>Defendant. | Case No. 2:25-cv-05971-JWH-E<br><br>**DISCOVERY MATTER**<br><br>**~~[PROPOSED]~~ ORDER ESTABLISHING A PROTOCOL FOR ELECTRONIC DISCOVERY**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. John W. Holcomb<br>Courtroom 9D, 9th Floor |

# [PROPOSED] ORDER ESTABLISHING PROTOCOL FOR ELECTRONIC DISCOVERY

## A. DEFINITIONS

1. “Extracted Text” means the text extracted from a Native Format file and includes all header, footer, and document body information.

2. “Metadata” means structured information that describes, explains, locates, or otherwise makes it easier to retrieve, use, or manage an information resource.

3. “Native Format” means the format of ESI in the application in which such ESI was originally created.

4. “OCR” means the optical character recognition file, which is created by software used in conjunction with a scanner that is capable of reading text-based documents and making such documents searchable using appropriate software.

5. “Producing Party” means a party in the above captioned matter that produces documents.

6. “Receiving Party” means a party in the above captioned matter to whom documents are produced

7. “Responsive Document” means any document that is responsive to any discovery requests served on the Producing Party in this litigation, which the

Producing Party has agreed to produce, or which the Producing Party has been ordered to produce by the Court.

8. "Tagged Image File Format" or "TIFF" refers to the CCITT Group IV graphic file format for storing bit-mapped images, with multiple compression formats and resolutions.

## B. SCOPE

1. This ESI Protocol Order will govern the production of ESI and paper documents. To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol Order, and production of such documents cannot be made in accordance with the terms of this ESI Protocol Order, the Parties will meet and confer concerning the potential formats of the production of any such documents.

2. Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information. Pursuant to the terms of this ESI Protocol Order, information regarding search processes and ESI practices may be disclosed, but compliance with this ESI Protocol Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI as irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party. For the avoidance of doubt, a Party's compliance with

this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.

3. The Parties shall meet and confer in good faith in an effort to agree upon search methods and terms or other filtering or categorization to be applied and timeframes for collection and review of ESI.

4. The Producing Party shall use commercially reasonable efforts to comply with the technical specifications herein, considering the capabilities of their eDiscovery tools and vendors. Parties shall meet and confer regarding any technical limitations that prevent strict compliance.

5. Except as noted herein, the Parties agree that the following instructions(“Instructions”) apply to the production of all ESI, including “paper” documents and files stored in electronic format, note files (both paper notes and electronic notes created using electronic note applications such as Microsoft OneNote), Word documents, PowerPoint documents, Excel documents, and Access databases. Nothing in this ESI Protocol Order is intended to be an exhaustive list of discovery obligations or rights of a Producing Party or a Receiving Party, or any other Party or non-Party.

6. The Parties and their attorneys do not intend by agreeing to this ESI Protocol Order to waive their rights to any protection or privilege, including the

attorney-client privilege and work product doctrine, or their rights to object to any discovery requests. This ESI Protocol Order does not address or resolve any objections to the scope of the Parties' respective discovery requests.

7. Notwithstanding anything to the contrary herein, the following document types are not discoverable in the Litigation except upon a showing of good cause, which shall include a showing that the information sought is likely material, that it is unavailable from other sources, and that its production will not impose undue burden or expense on the Producing Party:

i. Back-up tapes or other long-term storage media that were created strictly for use as a data back-up, disaster recovery medium, or a means of information restoration;

ii. Deleted, erased, or overwritten computer files, whether fragmented or whole, which were deleted in the regular course of business;

iii. Deleted, shadowed, damaged, residual, slack, fragmented, and/or other data only accessible by forensics;

iv. Data in metadata fields that are frequently updated automatically, such as last-opened dates, except as specified in this ESI Protocol Order;

v. Data stored in Random Access Memory ("RAM"), cache memory, or in temporary or cache files, including internet history, web browser cache, and cookie files, or other ephemeral data, wherever located;

vi. Operating system files and executable files;

vii. Data stored on photocopiers, scanners, and fax machines;

viii. Email attachments that are less than 25 kilobytes;

ix. Structural files not material to individual file contents that do not contain substantive content (e.g., .CSS, .XSL, .XML, .DTD, etc.).

x. Voicemail data; and

xi. Data stored as server, system, network and/or software application logs.

8. Nothing in this ESI Protocol Order prevents any Party from asserting, in accordance with the Federal Rules of Civil Procedure, that other categories of ESI are not reasonably accessible within the meaning of Rule 26(b)(2)(B).

9. The Parties shall meet and confer to resolve any disputes that arise under this ESI Protocol Order. In the event the Parties cannot reach agreement on a disputed matter, the Parties shall submit the matter to the Court.

Case 1:25-mc-00525 Document 1-1 Filed 10/23/25 Page 7 of 31

10. ESI shall include data collected from the following sources:

i. Email

ii. Locally stored files

iii. Cloud/Internet stored documents (Google Drive, Dropbox, Box.com, iCloud, Asana C, etc.)

iv. Chat communications (such as Slack, WhatsApp, Skype, Telegram or Discord)

v. Mobile and Handheld devices documents and data (including but not limited to text messages or other chat messaging media)

vi. Hard Copy Documents

vii. When agreed to, collaboration tools and project management platforms (Google Analytics, etc.)

11. Document Custodians: Each Party will disclose an initial list of proposed custodians reflecting those with information and/or documents responsive to the agreed-on scope of Rule 34 requests.

## C. <u>GENERAL PRODUCTION FORMAT</u>

1. **FORMAT:** Each ESI item will be produced in its native format, accompanies by TIFFs, Text Files, and a Load File as set out below.

2. **TIFFs**: Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each image will have a file name that is the unique Bates number of that image. Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape). Hidden content, tracked changes, edits, comments, notes, and other similar information viewable within the native file shall, to the extent reasonably practicable, also be imaged so that this information is captured on the produced image file. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively," unless such documents contain redactions, in which case the documents will be produced in TIFF format.

3. **Text Files:** Each ESI item produced under this ESI Protocol Order shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

i. OCR: A Producing Party may make paper documents available for inspection and copying/scanning in accordance with Fed. R. Civ. P. 34 or, additionally or alternatively, scan and OCR paper documents if it chooses. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR text files should indicate page breaks where possible. Even if OCR is used by a Producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR. In such instances, or in the event that a Producing Party does not choose to use OCR at all, the Producing Party will make the paper documents available for inspection and copying in accordance with Fed. R. Civ. P. 34.

ii. ESI: Emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available.

4. **Load File:** All production items will be provided with a delimited datafile or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. See **Appendix A**

for a list of the Meta Data fields. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load files in the production.

5. **Appearance:** Subject to any redactions, each document's TIFF image file shall contain the same information and same physical representation as the document did in its original format, whether paper or electronic, consistent with the processing specifications set forth in Section E. Documents that present imaging or formatting problems of which the Producing Party is aware at the time of production but has not been able to resolve shall be promptly identified by the Producing Party by e-mail to the Receiving Party within thirty (30) days after the production containing the problematic document(s), or the Producing Party may elect to produce those documents in native form consistent with Section C.9.

6. **Redactions:** If redaction takes place, it will be logged on a privilege log. Redaction of ESI will be performed on a TIFF imaged version of the document only, and native format files and extracted text will not be provided. Unredacted text in a redacted document must be made searchable using OCR. Any redactions must be clearly visible on the face of the produced document (e.g., the Parties should not use white boxes to make redactions on documents with a white background) and OCR searchable (e.g., labeled "Redacted").

7. **Document Unitization:** For electronic documents, all unitization should be defined within the data load file; this includes the designation of parent/attachments both for e-mail and attachments and for compressed files (such as ZIP or RAR files) and their contents.

8. **Color:** Documents containing color shall be produced in color unless the Producing Party makes a reasonable showing that the production of particular documents in color would be overly burdensome.

9. **Document Branding:** Each TIFF shall be stamped with the following information:

i. **Bates Number:** Each page of a document produced in TIFF file format shall have a legible, unique fixed-length numeric identifier ("Bates Number") containing eight (8) digits electronically "burned" onto the image in no less than 10-point font. Unless it would obscure, conceal or interfere with any information originally appearing on the document, the Bates Number shall be burned on the lower right-hand corner of the document. The Bates Number for each document shall be created so as to identify the Producing Party and the Bates Number (*e.g.*, "ABC00000001") and shall not contain spaces in the Document Number. Each Party shall have a unique

identifying name. Each document's confidentiality designation shall be included in the appropriate data field in the load file.

ii. **Confidentiality:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to the terms of a Protective Order entered by the Court in the Litigation, the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images. To the extent reasonably possible, this designation also should be included in the appropriate data field in the load file. Failure to comply with the procedures set forth in this ESI Protocol Order, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment.

10. **Native File Exceptions:** To the extent a Producing Party produces Microsoft Excel or other spreadsheet files, video or audio files, or other information that is only readable and/or usable in its Native Format, such documents shall be produced in their Native Format. To the extent documents that fall under this exception contain privileged information, and cannot be redacted or produced in TIFF format, such documents will be logged on a privilege log.

The Metadata load file for files produced natively shall contain a link to the produced Native Files via data values called "Native Link." To the extent a response to discovery requires production of discoverable electronic information contained in a structured database format, such as Microsoft Access, the Parties shall discuss the production format prior to production. Each electronic file produced in Native Format shall be assigned a unique Document Number. The Producing Party shall include a single-page TIFF image branded with this unique Document Number and the phrase "PRODUCED IN NATIVE FORMAT" branded in the center of the page. To protect the confidentiality of files produced natively, any confidentiality designations pursuant to the Stipulated Protective Order must appear on the TIFF placeholder on the lower left-hand corner in no less than 10-point font. Native file names shall be identical to the Document number, followed by the file extension, *e.g.*, ABC00000001.xls. No Party may attach to any pleading or any correspondence to any adverse or third-Party, or submit as an exhibit at a deposition or any other judicial proceeding, a copy of any document in Native Format produced by any Party without ensuring that the corresponding Bates number and confidentiality legend, as designated by the Producing Party, appears in the Native File name.

11. **Embedded Files:** If a document has another file embedded in it, (*e.g.*, a Word document that has a spreadsheet embedded in it), the embedded file

shall be produced as a standalone file. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved. Embedded files without substantive content, such as logos, icons, emoticons, and footers may be culled from a document family and need not be produced as separate documents by a producing document. Email attachments shall be extracted and processed as separate documents with family linking preserved; however, non-attachment embedded links (e.g., hyperlinks to external files) are not automatically extracted and may be provided separately if required for production.

12. **Production Media:** The Producing Party shall produce document images, native files, load files and metadata via secure file transfer protocol ("FTP").

13. **De-duplication:** The Parties shall use MD5 hash values to identify duplicate ESI and globally de-duplicate ESI. Family groups (e.g., an email and its attachments) shall be de-duplicated only against other family groups as entities, and no document that is not part of a family group shall be de-duplicated against a member of a family group. The Parties will not de-duplicate loose electronic documents or hard copy information against email attachments. The Parties will not treat a document containing handwritten notes, highlighting, or any other markings as a duplicate of a non-marked or annotated version of the same

document. A Party may de-duplicate ESI across its custodians or sources, but if that option is exercised, the Party shall identify each custodian who had a copy of the produced document in the ALL CUSTODIANS field in the Metadata load file. A Party may only de-duplicate "exact duplicate" documents and may not de-duplicate "near duplicate" documents, both of the quoted terms in this sentence being given their ordinary meaning in the e-discovery field. Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.

14. **Original Documents:** Nothing in this Stipulated Order shall eliminate or alter any Party's obligation to retain Native Format copies, including associated metadata, of all ESI preserved for and produced in the Litigation and/or original versions of all hard copy documents preserved for and produced in the Litigation.

15. **Third-Party Software and Legacy Systems:** To the extent that documents produced pursuant to this Stipulated Order cannot be rendered or viewed without the use of proprietary third-party software or legacy systems, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format.

### D. PAPER DOCUMENT PRODUCTION PROTOCOLS

1. **Scanning:** Where relevant documents are in hard copy format, the Producing Party shall scan and provide OCR copies of the documents.

2. **Coding Fields:** The Parties shall employ the coding and metadata fields reflected in the attached **Appendix A**.

3. **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Therefore, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records.

4. **File/Binder Structures**: Where the documents were organized into groups, such as folders, clipped bundles, and binders, this structure shall be maintained and provided in the load file to the extent reasonably practicable. The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning and ending document and attachment fields to the extent reasonably practicable. The Parties will make their best efforts to unitize documents correctly. Where a document, or a document group—such as folder, clipped bundle, or binder—has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

5. **Custodian Identification**: The Parties will utilize best efforts to ensure that paper records for a particular Document Custodian are produced in consecutive Bates stamp order.

**E. <u>PROCESSING SPECIFICATIONS</u>**

1. The Producing Party shall collect and process documents using forensically sound methods that avoid spoliation of data. The Producing Party will generate and preserve the MD5 hash values at the time of ESI processing. The Producing Party shall use the following specifications when converting ESI from its Native Format into TIFF image files prior to its production:

i. All ESI shall be processed with a single consistent time zone date and time setting.

ii. All tracked changes shall be maintained, to the extent reasonably feasible upon collection, so that all changes to a document are evident.

iii. Author comments shall remain or be made visible, to the extent reasonably feasible upon collection and processing.

iv. Hidden columns, rows, comments, and worksheets shall be made visible prior to processing, to the extent reasonably feasible upon collection and processing.

v. PowerPoint documents should be processed with hidden slides and speaker's notes, and comments unhidden prior to processing, and should display both the slide, speaker's notes, and comments on the TIFF image, to the extent such elements

are made visible during collection. Auto-populated fields, with the exception of auto-populating "page-number" fields, shall be replaced with text indicating the field name. For example, auto-populating "date" fields shall be replaced with the text "DATE" (or other similar text) and auto-populating "file path" fields shall be replaced with the text "PATH" (or other similar text).

vi. For archive files (zip, jar, rar, gzip, etc.), extract from the archive and maintain family relationships; do not include the source/container file itself in the production.

2. **Email Collection and Processing:**

i. **Email Threading:** The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a Receiving Party to identify every custodian who had a copy of a produced document or email, or (b) remove from a production any unique branches and/or attachments contained within an email thread.

ii. **Email Domains:** Excluded from any ESI search process shall be uniquely identifiable categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts that do not concern relevant topics. The Parties agree to disclose domain names excluded under this section at the time of production.

**F. USE OF TECHNOLOGY ASSISTED REVIEW**

1. **Use of TAR:** The Parties may use Technology Assisted Review ("TAR") to sort documents for linear review without disclosure of that use. The Parties shall not utilize TAR in combination with search terms to cull or narrow the review set. If a Party elects to use TAR to cull or otherwise limit the volume of ESI subject to linear review, the requirements set forth in Section F.2 shall apply.

2. **Use of TAR:**

i. **Paper Documents**: The Parties agree to meet and confer to determine whether paper documents may be included in a TAR process.

ii. **Excluded Documents**: Any document excluded from TAR must undergo separate analysis.

iii. **Notice**: Before using TAR to cull or otherwise limit the volume of ESI subject to linear review, a Producing Party must provide to the Receiving Party a written description of the TAR tool and method(s) for identifying or eliminating documents for review, including (1) the name of any TAR software (name and version); (2) the vendor used; (3) the manner in which TAR will be employed for the review (e.g., Simple Active Learning, Continuous Active Learning); and (4) fields on which TAR will be applied.

iv. **Validation Report**: Prior to the deadline for substantial completion of document productions, a Party utilizing TAR must provide to the Receiving Party a Validation Report containing the volume of documents included to TAR, the volume excluded and the reasons for exclusion (e.g., filetype, size, lack of extracted text), and the information required by Section F.2.v below.

v. **Validation Standards**:

1. The determination to stop review pending validation shall be determined by the type of TAR applied:

a. For a party using TAR 1.0 (Simple Active Learning, Predictive Coding) a Control Set will be used to calculate statistical metrics like recall, precision, richness/prevalence, and depth for recall. Once the predictive coding model has been sufficiently trained, documents scored on or above the identified cutoff score, along with their families, will be eligible for production. Parties will report the recall, precision, richness/prevalence, and depth for recall of this population based on a 95 percent confidence level and 5 percent margin of error and will target a recall rate of 80%. In addition to the Control Set measurements, parties using a TAR 1.0 methodology will identify a Validation Set to confirm the overall performance of the model. This set will be randomly selected from the predicted non-responsive documents (excluding predicted responsive family members) and represent a 95 percent confidence level and 5

percent margin of error. The metrics of the Validation Set and Control Set will be reported in the Validation Report.

b. For a party using TAR 2.0 (Continuous Active Learning) statistical sampling will be used to validate the appropriateness of terminating the TAR process and estimating recall. Parties will target an estimated recall of 80%. Once the parties determine that it is likely that a high percentage of responsive documents have been reviewed based on regular metrics tracking, an Elusion Sample will be drawn from the documents excluded from review by the TAR process. The sample will be sufficiently sized to provide a 95 percent confidence level and 5 percent margin of error. The richness of this sample (the Elusion Rate) will be used to estimate the number of responsive documents remaining in the unreviewed population. The total number of responsive documents in the

Case 2:25-mc-00525 Document 3 Filed 10/23/25 Page 23 of 31

TAR population will be estimated by the sum of the estimated number of responsive documents in the unreviewed population and the total number of documents identified as responsive by the TAR process. Recall will be estimated by dividing the total number of documents identified as responsive by the TAR process by the estimated total number of responsive documents. If the sampling indicates that 80% recall has not been achieved, then the review process will continue unless the party demonstrates that the burden of continuing the review process is outweighed by the benefit. If the sampling indicates that 80% recall has been achieved, then TAR and review process will be terminated.

2. Any responsive documents found in the elusion sample will be produced and identified as such and the Parties may request additional searches or training.

vi. Aside from the Elusion Set, a Producing Party need not conduct any additional review of information subjected to, but

not retrieved by, a TAR tool as part of the identification of the subset of information that will be subject to review and production.

## G. PRIVILEGED MATERIALS

1. **Privilege Log:** Any document or e-mail or redacted portion of document/e-mail that is identified as privileged for any reason and logged on a privilege log is subject to the following:

i. Within thirty (30) days after the completion of a Party's document production, the Producing Party shall serve on the Receiving Party a privilege log containing any documents withheld on the basis of any claim of privilege or other legal protection ("Privileged Material"). The Parties shall promptly provide a privilege log for any subsequently withheld documents. To the extent the Producing Party makes multiple document productions, the Producing Party shall supplement and add to its original privilege log so that only one log is used throughout the Litigation.

ii. The privilege log shall include sufficient information to allow the Receiving Party to reasonably assess the claim of privilege, including but not limited to the following information: (i) the

date of the document (i.e., the date of the last email in the email chain); (ii) the author(s)/sender(s); (iii) recipients (including recipients copied and/or blind copied); (iv) a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the basis of the claim of privilege; and (v) the type or nature of the privilege asserted (e.g., attorney-client privilege, work-product doctrine).

iii. The Parties are only required to provide a single privilege log entry for multiple email messages in the same email thread to the extent such messages are included within one individual email thread. The email that will be logged will be the most inclusive thread with any associated attachments.

iv. Documents that contain both privileged and non-privileged/work product protected information will be produced with the privileged/protected information redacted and the non-privileged/protected information visible. Documents or portions thereof that contain redactions for information withheld on privilege/work product grounds will be identified in a privilege log in accordance with Rule

26(b)(5) and this ESI Protocol Order—with the exception that redacted documents need not be logged provided the basis for the redaction is made plain on the face of the redacted document (e.g., the email to/from is between counsel and is visible in the produced version of the document).

2. **Non-Waiver:** Pursuant to Federal Rule of Evidence 502(d), the production of any material or information shall not be deemed to waive any privilege or work product protection in the Litigation or in any other federal or state proceeding. Nothing in this Paragraph is intended to or shall serve to limit a Party's right to conduct a review of any material or information for relevance, responsiveness, and/or segregation of privileged and/or protected information before production, subject to the below.

3. **Clawback:** Any Party or non-Party may request the return of any produced material or information on the grounds of privilege or work product protection by identifying it, stating the basis for withholding such material or information from production, and providing any other information that would be listed on a supplemental privilege log. Federal Rule of Civil Procedure 26(b)(5)(B) shall govern the claw back of produced documents or information on the grounds of privilege or work product protection. If a Party or non-Party

requests the return of such produced material or information then in the custody of one or more Parties, the possessing Parties shall within fifteen (15) days:

i. Destroy or return to the Producing Party or non-Party the produced material or information and all copies thereof, and expunge from any other document or material, information derived solely from the produced material or information; or

ii. Notify the Producing Party or non-Party that it wishes to challenge the claim of privilege or work product protection and has sequestered the material until the issue can be resolved. The Parties agree to meet and confer regarding the claim of privilege. If, at the conclusion of the meet-and-confer process, the Parties are still not in agreement, they may bring the issue to the Court. A Party challenging a claw-back request under this Section may not use the content of the clawed-back document for the purpose of filing a motion with the Court under seal that challenges whether or not the document is privileged or work product only. A Party challenging a claw-back request under this Section may not use the content of the clawed-back documents for any other purpose unless and until the Court has addressed the challenge.

**H. THIRD-PARTY DISCOVERY**

1. A Party that issues a non-party subpoena (the "Issuing Party") shall include a copy of the Protective Order concerning confidentiality entered in this litigation with the subpoena.

2. The Issuing Party shall provide to all other Parties within 10 business days of receipt a copy of any documents and ESI (including any metadata) obtained under subpoena.

3. If the non-party production is not Bates-stamped, the Issuing Party will endorse the non-party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

**IT IS SO ORDERED.**

DATED: 10-23-25

Hon. Charles F. Eick
United States Magistrate Judge

# APPENDIX A.
# METADATA FIELDS[1]

Note: Cloud-specific metadata fields (e.g., titles, types, owners, dates) shall be provided if available and collected via load file from the source repository; otherwise standard document metadata fields shall suffice.

1. **BegBates** –Beginning Bates number.
2. **EndBates** – Ending Bates number.
3. **BegAttach** – Bates number of the first page of a Family range.
4. **EndAttach** – Bates number of the last page of a Family range.
5. **ParentID** – Parent Bates number, populated only for child records.
6. **PageCount** – Number of pages in a document.
7. **FileExtension** – Original file extension as the document was maintained in the ordinary course.
8. **FileSize** – File size in bytes.
9. **DocTitle** – Document title as extracted from a Native File
10. **DocSubject** – Any value populated in the Subject field of the document properties.
11. **Custodian** – Primary custodian full name.
12. **All Custodians** – All custodians from which the document was collected prior to deduplication.

[1] To be provided to the extent reasonably available.

13. **Author --** Document author information for non-email ESI.

14. **LastSavedBy** – User who last saved ESI.

15. **From** – Sender of an email or Chat Communication.

16. **To** – Recipient of an email or all recipients of a Chat Communication.

17. **CC** – Additional Recipients.

18. **BCC -** Blind Additional Recipients.

19. **Email Subject** – Subject line of e-mail.

20. **Attachments** – Name of attached file(s) as maintained in the ordinary course of business.

21. **Number of Attachments** – Number of attachments to an e-mail.

22. **DateCreated** – File date and time created as extracted from the Native File.

23. **DateModified** – File date and time modified as extracted from the Native File.

24. **DateSent** – Date and time sent.

25. **DateReceived** – Date and time received.

26. **FileName** – Name of the file as maintained in the ordinary course of business with extension.

27. **File/Folder Path** – Original file/path of the location where the item was located at the time of collection. If an email extracted from a container, e.g., from a .pst file, it should contain the name and location of the email

container, and the folder within the container from which the email was collected.

28. **Hash** – The hash value generated at processing.

29. **Collaboration Channel/Chat Name** – Name of the channel or chat where the Chat Communication occurred, if provided via load file during ingestion of chat data.

30. **Chat Conversation ID** – Unique ID to identify all messages and attachments within a Chat Communication channel/thread (i.e., messages involving the same participants or occurring within the same thread), if provided via load file during ingestion of chat data.

31. **Time Zone Processed** – Time zone data was processed (e.g, UTC).

32. **TextPath** – The path to the text file for each record in the production volume, including filename.

33. **NativePath** – The path to the Native Format file on the delivery media, including the file name.

34. **Confidentiality** – Confidentiality level if assigned pursuant to any applicable Protective Order or stipulation.[2]

35. **Redacted** – Descriptor for documents that have been redacted. “Yes” for redacted documents; “No” for un-redacted documents.

---

[2] To the extent there is a discrepancy between the metadata field and the face of the document, the highest designation controls.

# D

Case 1:25-mc-00525 Document 3-1 Filed 10/14/25 Page 111 of 130

Christopher G. Renner (*Pro Hac Vice*)
cgrenner@dhillonlaw.com
Jonathan M. Shaw (*Pro Hac Vice*)
jshaw@dhillonlaw.com
Andrew K. Mann (*Pro Hac Vice*)
akmann@dhillonlaw.com
Domenic P. Aulisi (*Pro Hac Vice*)
daulisi@dhillonlaw.com
**DHILLON LAW GROUP INC.**
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(571) 430-2240 (voice and fax)

Brandon Q. Tran (CA Bar No. 223435)
btran@dhillonlaw.com
**DHILLON LAW GROUP INC.**
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660
(949) 340-1968 (voice and fax)

Attorneys for Plaintiff
The PLS.com LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION – ORANGE COUNTY**

| | |
|---|---|
| The PLS.com, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>The National Association of Realtors,<br><br>Defendant. | Case No. 2:25-cv-05971-JWH-E<br><br>**STIPULATED PROTECTIVE ORDER**<br><br>Assigned to the Hon. John W. Holcomb<br>Courtroom 2<br><br>Action Filed: July 1, 2025 |

1. INTRODUCTION

1.1. Purposes and Limitations.

As the parties have represented that discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted, this Court enters the following Protective Order.[1] This Order does not confer blanket protections on all disclosures or responses to discovery. The protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. Further, as set forth in Section 12.3, below, this Protective Order does not entitle the parties to file confidential information under seal. Rather, when the parties seek permission from the court to file material under seal, the parties must comply with Civil Local Rule 79-5 and with any pertinent orders of the assigned District Judge and Magistrate Judge.

1.2. Good Cause Statement.

In light of the nature of the claims and allegations in this case and the parties' representations that discovery in this case will involve the production of trade secrets and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial

[1] This Stipulated Protective Order is substantially similar to the Stipulated Protected Order in the Prior Action (as defined herein); which was substantially based on the model protective order provided under Magistrate Judge Rozella A. Oliver's Procedures.

Case 1:25-mc-00525 Document 3-1 Filed 10/14/25 Page 113 of 130

information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. To expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in connection with this action, to address their handling of such material at the end of the litigation, and to serve the ends of justice, a protective order for such information is justified in this matter. The parties shall not designate any information/documents as confidential without a good faith belief that such information/documents have been maintained in a confidential, non-public manner, and that there is good cause or a compelling reason why it should not be part of the public record of this case.

1.3. Acknowledgment of Procedure for Filing Under Seal.

The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006); *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause or compelling reasons with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The

parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL or HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration. Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

2. DEFINITIONS

2.1 Prior Action: the previously dismissed action captioned *The PLS.com, LLC v. The National Association of Realtors, et al.*, Case No. 2:20-cv-04790-JWH-RAO.

2.2 Action: *The PLS.com, LLC v. The National Association of Realtors*, Case No. 2:25-cv-05971-JWH-E.

2.3. Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.4. "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), and as specified above in the Good Cause Statement.

2.5. "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "CONFIDENTIAL" Information or Items, the disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.6. Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

2.7. Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

2.8. Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things) that are produced or generated in disclosures or responses to discovery in this matter or in the Prior Action.

2.9. Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

2.10. House Counsel: attorneys who are employees of a party to this Action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11. Non-Party: any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

2.12. Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent or advise a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

2.13. Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staff).

2.14. Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.15. Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16. Protected Material: any Disclosure or Discovery Material that is designated as “CONFIDENTIAL” or “HIGHLY CONFIDENTIAL -- ATTORNEYS’ EYES ONLY.”

2.17. Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3. SCOPE

The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any deposition testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material, other than during a court hearing or at trial. Any use of Protected Material during a court hearing or at trial shall be governed

by the orders of the presiding judge. This Order does not govern the use of Protected Material during a court hearing or at trial.

Materials produced in the Prior Action may be used by the Parties in this Action as if produced and designated hereunder and shall be subject to the protections and obligations of this Order.

4. DURATION

Once a case proceeds to trial, information that was designated as CONFIDENTIAL or HIGHLY CONFIDENTAL – ATTORNEYS' EYES ONLY or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge in advance of the trial. *See Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents produced in discovery from "compelling reasons" standard when merits related documents are part of court record). Accordingly, the terms of this protective order do not extend beyond the commencement of the trial.

5. DESIGNATING PROTECTED MATERIAL

5.1. Exercise of Restraint and Care in Designating Material for Protection.

Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items or oral or written communications that qualify so that other portions of the material, documents, items or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order. Mass, indiscriminate or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development

process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions. If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

5.2. Manner and Timing of Designations.

Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) For information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins). A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL", or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" legend to each page that contains Protected Material. If only a portion

of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) For testimony given in depositions, the entire transcript shall be deemed "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" for a period of thirty days following receipt of the final transcript by the Designating Party, to allow time for the Designating Party to specifically identify, by page and line number, any testimony that qualifies for protection under this Order.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY." If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3. Inadvertent Failures to Designate.

If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6. CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1. Timing of Challenges.

Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.

6.2. Meet and Confer.

The Challenging Party shall initiate the dispute resolution process under Local Rule 37-1.

6.3. Burden.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1. Basic Principles.

A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending or attempting to settle this Action. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION). Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2. Disclosure of "CONFIDENTIAL" Information or Items.

Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action;

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff;

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(h) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(i) any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions.

7.3. Disclosure of "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" Information or Items.

Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) the court and its personnel;

(d) private court reporters and their staff to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(e) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(g) any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions

8. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena

Case 1:26-mc-00525 Document 1-1 Filed 09/24/26 Page 123 of 130

or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected. If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission, or unless otherwise required by the law or court order. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

9. <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a) The terms of this Order are applicable to information produced by a NonParty in this Action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If a Non-Party represented by counsel fails to commence the process called for by Local Rules 45-1 and 37-1 within 14 days of receiving the notice and accompanying information or fails contemporaneously to notify the Receiving Party that it has done so, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If an unrepresented Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court unless otherwise required by the law or court order. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or

Case 1:25-mc-00525 Document 1-1 Filed 10/21/25 Page 125 of 130

persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

## 11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

Pursuant to Federal Rule of Evidence 502, the Parties agree that, if a Producing Party inadvertently produces a document, a tangible item, or electronically stored information that it later discovers or in good faith asserts to be privileged, protected by the work product doctrine, or subject to some other immunity from disclosure ("Privileged Material"), the production of that Privileged Material shall not be deemed to constitute a waiver of any applicable privilege, work product protection, or immunity from disclosure. Upon discovery of any inadvertent disclosure of Privileged Material, the Producing Party shall immediately notify each Receiving Party of the inadvertent production, and request either the return or confirmation of destruction of the Privileged Material. Upon receiving such a notice, the obligations of the Receiving Party or Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). In addition, within five (5) business days of receiving such a notice, each Receiving Party shall either (i) return or confirm destruction of all such Privileged Material or (ii) confirm that all such Privileged Material has been sequestered, notify the Producing Party that it intends to challenge the claim of privilege, work product protection, or immunity from disclosure, and initiate the dispute resolution process provided for by Local Rule 37-1 et seq. This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review.

//

//

12. MISCELLANEOUS

12.1. Right to Further Relief.

Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

12.2. Right to Assert Other Objections.

By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3. Filing Protected Material.

A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5 and with any pertinent orders of the assigned District Judge and Magistrate Judge. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

13. FINAL DISPOSITION

After the final disposition of this Action, as defined in paragraph 4, within 60 days of a written request by the Designating Party, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies

(by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

14. VIOLATION

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

DATED: September 11, 2025

DHILLON LAW GROUP INC.

By: /s/ Christopher G. Renner

Christopher G. Renner
Attorneys for Plaintiff
The PLS.com, LLC

DATED: September 11, 2025

MASSEY GAIL LLP

By: /s/ Matthew M. Collette

Matthew M. Collette
Attorneys for Defendant
The National Association of Realtors

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.**

DATED: September 11, 2025



Hon. Charles F. Eick
United States Magistrate Judge

## SIGNATURE ATTESTATION

I hereby attest that all signatories listed above, on whose behalf this stipulation is submitted, concur in the filing's content and have authorized the filing.

DATED: September 11, 2025

DHILLON LAW GROUP INC.

By: /s/ Christopher G. Renner

Christopher G. Renner
Attorneys for Plaintiff
The PLS.com, LLC

Case 1:25-mc-00525 Document 3-1 Filed 10/24/25 Page 130 of 130

# EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, ____________________ [print or type full name], of __________________ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on ______[date] in the case of *The PLS.com, LLC v. The National Association of Realtors*, Case No. 2:25-cv-05971-JWH-E. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action. I hereby appoint ___________________________ [print or type full name] of _________________________________________ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: ________________________________________

City and State where sworn and signed: _____________________________

Printed name: ________________________________

Signature: ___________________________________