**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SUBPOENA ISSUED IN<br><br>*The PLS.com, LLC v. The National Association of Realtors*, pending in the Central District of California, Case No. 2:25-cv-05971 | Misc. No. 1:26-mc-00525 |
| Ashton Alexander, Robert Reffkin, and Cory Perkins<br><br>Petitioners<br><br>-against-<br><br>The National Association of Realtors<br><br>Respondent. | **ORAL ARGUMENT REQUESTED** |

**RESPONDENT'S MEMORANDUM IN OPPOSITION TO COMPASS'S MOTION TO QUASH AND IN SUPPORT OF ITS CROSS-MOTION TO TRANSFER AND COMPEL**

# TABLE OF CONTENTS


BACKGROUND ..... 4

I. THE UNDERLYING LITIGATION OVER THE CCP AND COMPASS'S ROLE ..... 4

A. PLS's Antitrust Lawsuit Challenging the Clear Cooperation Policy ..... 4

B. Compass's Multi-Year Campaign against the CCP ..... 6

II. NAR'S SUBPOENAS AND COMPASS'S OBJECTIONS ..... 8

III. COMPASS MOVES TO QUASH ..... 10

ARGUMENT ..... 10

I. THE COURT SHOULD TRANSFER THIS DISPUTE TO C.D. CAL. ..... 11

II. THIS COURT SHOULD COMPEL THE PRODUCTION OF NAR'S LAST SET OF NARROWED REQUESTS. ..... 13

A. Compass cannot offer Alexander for a deposition while refusing to produce documents relevant to her likely testimony. ..... 14

B. Compass's boilerplate claims of undue burden are unfounded. ..... 17

1. Compass's boilerplate claims of undue burden are unfounded. ..... 17

2. The documents NAR seeks are not available from other sources. ..... 19

3. Compass's threadbare PLS I production does not address NAR's requests. ..... 19

C. NAR's document requests are narrowly tailored to pinpoint relevant documents without imposing an undue burden. ..... 20

III. THE COURT SHOULD NOT AWARD SANCTIONS. ..... 25

CONCLUSION ..... 27

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(C) ..... 29

# TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Deng*,
No. 25-MC-137 (GHW) (RWL), 2025 WL 1183051 (S.D.N.Y. Apr. 21, 2025) *report and recommendation adopted*, No. 1:25-MC-137-GHW, 2025 WL 1313426 (S.D.N.Y. May 6, 2025) ........ 12

*Am. Plan Adm'rs v. S. Broward Hosp. Dist.*,
39 F.4th 59 (2d Cir. 2022) ........ 12

*Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*,
319 F.R.D. 277 (N.D. Cal. 2017) ........ 19

*Blagman v. Apple Inc.*,
No. CV138496PSGPLAX, 2014 WL 12607841 (C.D. Cal. Jan. 6, 2014) ........ 14, 18

*Carroll v. Trump*,
No. 20-CV-7311 (LAK), 2024 WL 97359 (S.D.N.Y. Jan. 9, 2024) ........ 24

*Cui v. Agua Fria Senior Living LP*,
No. CV 26 MISC. 406 (SLC), 2026 WL 2884404 (S.D.N.Y. Sept. 25, 2026) ........ 13

*Davis v. Kelly Servs., Inc.*,
No. CV 17-1699-GW (PLAX), 2017 WL 11633478 (C.D. Cal. Oct. 23, 2017) ........ 24

*de Jesus v. Cao*,
No. 1:24-CV-09901, 2026 WL 1230841 (S.D.N.Y. May 5, 2026) ........ 14

*E4 Strategic Sols., Inc. v. Pebble Ltd. P'ship*,
No. SAMC1500022DOCDFMX, 2015 WL 12746706 (C.D. Cal. Oct. 23, 2015) ........ 12

*Great Am. Ins. Co. v. Gemstone Prop. Mgmt., LLC*,
No. 23-CV-09100 (LJL), 2025 WL 1166993 (S.D.N.Y. Mar. 17, 2025) ........ 17

*Great Am. Ins. Co. v. Gemstone Prop. Mgmt., LLC*,
No. 23-CV-9100 (LJL), 2026 WL 353609 (S.D.N.Y. Feb. 9, 2026) ........ 17, 18

*Harapeti v. CBS Television Stations Inc.*,
No. 21 MISC. 680 (PAE), 2021 WL 3932424 (S.D.N.Y. Sept. 2, 2021) ........ 10

*Hilb Grp. of N.Y., LLC v. Associated Agencies, Inc.*,
No. 23-MC-264 (LJL), 2023 WL 5183690 (S.D.N.Y. Aug. 10, 2023) ........ 12

*In re Dana Corp.*,
574 F.3d 129 (2d Cir. 2009) ........ 15

*In re DiDi Glob. Inc. Sec. Litig.*,
No. 21-CV-5807 (LAK), 2025 WL 1735412 (S.D.N.Y. June 23, 2025) .............................. 15

*In re Ex Parte Application of Kleimar N.V.*,
220 F. Supp. 3d 517 (S.D.N.Y. 2016) ........................................................................ 18

*In re Honeywell Int'l, Inc. Sec. Litig.*,
230 F.R.D. 293 (S.D.N.Y. 2003) ............................................................................... 18

*In re Orthogen Int'l GmbH*,
No. 23-MC-152 (VSB)(KHP), 2026 WL 320454 (S.D.N.Y. Feb. 5, 2026).......................... 14

*In re Ramaekers*,
33 F. Supp. 2d 312 (S.D.N.Y. 1999) .......................................................................... 10

*Mountain Farms, LLC v. Rural Cmty. Ins. Co.*,
301 F.R.D. 426 (N.D. Cal. 2014)................................................................................ 12

*New York v. Microsoft Corp.*,
No. CIV A. 98-1233 (CKK), 2002 WL 649492 (D.D.C. Apr. 8, 2002)............................... 10

*Nguyen v. Lotus By Johnny Dung Inc.*,
No. SACV1701317JVSJDEX, 2019 WL 4570032 (C.D. Cal. Apr. 12, 2019) ..................... 17

*Pandora Jewelry, LLC v. Blue Time, Inc.*,
No. 22-MC-238 (AT) (RWL), 2025 WL 3214075 (S.D.N.Y. Nov. 18, 2025) ..................... 14

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
516 F. Supp. 3d 1047 (C.D. Cal. 2021),
*rev'd and remanded*, 32 F.4th 824 (9th Cir. 2022)................................................................. 5

*Preston Hollow Cap. LLC v. Nuveen Asset Mgmt. LLC,*
343 F.R.D. 460 (S.D.N.Y. 2023) ............................................................................... 26

*Securitas Elec. Sec., Inc. v. DeBon*,
No. 20CIV5323CMJW, 2022 WL 633874 (S.D.N.Y. Mar. 4, 2022)................................... 18

*Stati v. Space Expl. Techs. Corp.*,
No. MC2000023FMOAGRX, 2020 WL 5766270 (C.D. Cal. Sept. 8, 2020) ....................... 17

*Tennison v. City & County of San Francisco*,
226 F.R.D. 615 (N.D. Cal. 2005)................................................................................ 15

*Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co. LLC*,
No. 21 CIV. 10753 (DEH), 2024 WL 3498850 (S.D.N.Y. July 22, 2024) ........................... 17

**Statutes**

Fed. R. Civ. P. 26 ............................................................................................. passim

Fed. R. Civ. P. 30 .......... 25

Fed. R. Civ. P. 45 .......... passim

Fed. R. Evid. 612 .......... 24

This dispute is about one thing. Compass wants to supply PLS[1] a friendly Compass witness while simultaneously, and blanketly, refusing to produce ***any*** documents for fair cross-examination. That hand-picked witness is Compass's Chief Strategy Officer, Ashton Alexander.

The country's largest residential real estate brokerage with over $200 billion in annual sales volume, Compass is absolutely not a disinterested non-party "caught in the middle." Compass Memo ("MTQ") Dkt. 2, at 2. It wants to help PLS because both PLS and Compass seek to invalidate policies like NAR's Clear Cooperation Policy (CCP) for their own benefit, at the expense of a transparent and competitive marketplace. Compass has campaigned vigorously to challenge the CCP from the time it was first proposed six years ago. In fact, PLS's emails show that Compass CEO Robert Reffkin and Alexander herself coordinated with PLS co-founder Mauricio Umansky in their shared "quest" against the CCP—Alexander circulated commentary about "***how important PLS.com v. NAR, the Ninth Circuit decision, is to Compass***." A1018[2]; A7.

Compass has also publicly threatened MLSs that it would "spend millions of dollars to sue" them if they enforced rules related or similar to the CCP. A20–25; A1150–55; A1167–72. Those are not mere idle threats; Compass is actively litigating with several MLSs in this Court and in the Central District of California. *See, e.g., Compass, Inc., et al. v. Cal. Reg'l Multiple Listing Serv. Inc.*, No. 26-cv-06121 (C.D. Cal. Oct. 16, 2026), ECF No. 1; *Ariz. Reg'l Multiple Listing Serv., Inc., et al. v. Compass Inc.*, No. 26-cv-09253 (S.D.N.Y. Oct. 22, 2026), ECF No. 1.

---

[1] Unless otherwise stated, NAR uses the same acronyms for party names as those in Compass's moving papers.

[2] Citations to NAR's appendix of exhibits are denoted "A ___" to reference the page number of the appendix upon which the cited materials are located. All emphasis in such citations is added.

Compass's own public actions confirm its motive to supply PLS with friendly testimony while thwarting NAR's cross-examination.

PLS first injected Compass witnesses into this case with its Rule 26(a)(1) disclosures. Compass asserts that PLS "amended those initial disclosures to remove [the Compass witnesses]." MTQ Brief at 4. That is false. PLS confirmed as much. Grieves Decl. ¶ 55; A1049. NAR issued subpoenas to the disclosed witnesses. A29–31; A39–166; A168–296; A298–426; A428–555; A557–685. Compass served blanket, boilerplate objections, refusing to produce anything. A687–709; A711–37; A739–65; A767–89; A791–817. Despite NAR's many efforts to negotiate their scope, Compass's position never changed. A829–30; A826–27. Compass steadfastly refused to discuss the scope of NAR's requests—announcing that it simply would not produce *any* documents.

PLS then said it would depose Compass's CEO Robert Reffkin, whom PLS had not previously disclosed. So, NAR issued an even narrower set of document requests to Reffkin. A837–38; A840–968. Compass answered with the same boilerplate objections. A970–75; A977–94. It then confirmed that it would "***stand on all of its objections***." A996.

After months of failed negotiation, Compass issued a "final offer" under which Alexander would sit for a five-hour deposition yet would "***not be producing any documents.***" A1000. NAR offered again on October 13 to narrow its requests and address any burden Compass might identify. A1005–06. Compass never responded to that offer. Six days later, it announced that PLS had accepted Compass's offer of Alexander's deposition but that Compass would move to quash every subpoena NAR had served. A1008–9.

Compass's position is not reasonable. It insists that producing documents would be unduly burdensome, but it has offered no evidence of burden as to any specific request. It simply points

to its outdated production—in response to a ***PLS subpoena***—of 257 documents from a single custodian (not Alexander), made years before the latest developments relating to this highly contentious industry topic. MTQ Brief at 4. Yet Compass finds the capacity to present a senior executive at PLS's request. And it now brazenly asks the Court to sanction NAR for insisting on the right to documents to examine that witness. MTQ Brief at 7.

Despite the shell game Compass and PLS have played over whether any Compass witnesses would testify (and if so, who), NAR has remained willing to focus its document requests. The last set it issued—when it appeared that Compass's CEO would testify—is modest. A846–47. These generally cover:

- Compass's position on its agents' use of PLS and Compass's relative share of private-network listings,
- The price study Compass publicly promotes to potential home sellers, and
- Compass's Three-Phased Marketing disclosure policies.

Each request tracks a merits issue PLS is pressing; Compass does not argue otherwise. Several seek only documents "sufficient to show" a fact. *Id.* One seeks a single, specifically identified analysis and its underlying data, which Compass touts publicly. A846. Others are contingent on Alexander's own testimony. None calls for open-ended email review, and only Compass holds this information. Yet Compass has refused to produce anything.

Timing matters. ***For weeks***, Compass insisted it would produce no witnesses if NAR sought any documents. A833–34. But on October 19—a month before the close of fact discovery in the underlying case—Compass reversed course and said that it would present Alexander but move to quash NAR's subpoenas. This last-minute about-face further reveals Compass's gamesmanship. Compass cannot sponsor a witness but hide her documents. The Court should deny

the motion to quash and order Compass to produce documents in time for NAR to use them in Alexander's deposition.

## BACKGROUND

NAR did not inject Compass into this lawsuit: PLS did, by listing five Compass witnesses (including Alexander, but not Reffkin) on its Rule 26(a)(1) disclosures. A29–31. Those disclosures were never amended to remove the Compass witnesses. Grieves Decl. ¶ 55; A1049. Having done so—and given Compass's willingness to present a senior executive for oral testimony—NAR is reasonably entitled to documents to fairly cross-examine that executive. Compass is well-heeled and motivated to help PLS. It cannot agree to selectively help PLS while stonewalling NAR.

### I. THE UNDERLYING LITIGATION OVER THE CCP AND COMPASS'S ROLE

To evaluate the parties' positions, the Court must understand the broader context surrounding this motion, the underlying litigation between PLS and NAR, and why PLS seeks testimony from Compass.

#### A. PLS's Antitrust Lawsuit Challenging the Clear Cooperation Policy

PLS brought the underlying antitrust lawsuit against NAR in the Central District of California (C.D. Cal.) over a rule called the Clear Cooperation Policy, or CCP. A1056–92. Broadly speaking, NAR—a national trade association of real estate professionals of all stripes—passed the CCP in November 2019 by an overwhelming vote of NAR's Board of Directors. A1190–94. In its most general sense,[3] the CCP promotes "clear cooperation" among its members. The policy states, in relevant part, that listing brokers who are MLS members must submit exclusive listings to that MLS for cooperation with other MLS participants within one (1) business day of marketing a

[3] For the avoidance of doubt (and lest any party attempt to take these descriptions out of context), there are many details about the CCP, how it works, its relationship with other rules and structures, and other industry aspects that are simplified here.

property to the public.[4] It promotes access to residential properties that are available for sale and that are publicly marketed for ***all*** NAR-member brokers and agents. Notably, the NAR-affiliated MLSs adopt, implement, and enforce the CCP—not NAR.

PLS contends that it was "formed as the 'Pocket Listing Service.'" A1059 ¶ 8. By joining its network, "licensed real estate professionals could ***privately share*** pocket listings with other licensed real estate professionals while avoiding the exposure of those listings through the NAR-affiliated MLSs." *Id.* According to PLS, the CCP "eliminates the viability of the private network of pocket listings," like its own. *Id.* ¶ 14.

PLS first sued NAR and three MLSs over the CCP in May 2020 in *PLS.com, LLC v. Nat'l Ass'n of Realtors et al.*, 2:20-cv-04790 (C.D. Cal.) ("*PLS I*"). In February 2021, the district court dismissed, but in April 2022, the Ninth Circuit reversed and remanded. *See PLS.com, LLC v. Nat'l Ass'n of Realtors*, 516 F. Supp. 3d 1047 (C.D. Cal.), *rev'd and remanded*, 32 F.4th 824 (9th Cir. 2022). After PLS and NAR conducted some discovery,[5] PLS voluntarily dismissed *PLS I* in early 2024. In July 2025, it refiled the current underlying case, *PLS II,* 2:25-cv-05971 (C.D. Cal.). A1057–92.

The parties have engaged in extensive party and third-party discovery in advance of the current November 20, 2026 fact discovery deadline.

---

[4] A Multiple Listing Service (MLS) is a collaborative broker network and database used to share comprehensive property listings and facilitate cooperation among real estate professionals. There are hundreds of MLSs around the country, some (but not all) of which are affiliated with NAR. Prior to the CCP's passage, most MLSs required mandatory submission by agents of all exclusive listings in a set time period following the execution of the listing agreement between the agent and their client, the home seller. CCP was enacted in part to combat the problem of agents who were shirking their obligations under those "mandatory submission" principles through systematic abuse of an exemption, or purposeful non-compliance. The CCP only applies to those listings that were already subject to mandatory submission.

[5] This included the limited discovery in response to a PLS subpoena Compass references. MTQ Brief at 4; *see infra* p. 19.

### B. Compass's Multi-Year Campaign against the CCP

According to its press release, Compass is "the largest residential real estate brokerage in the United States" with over "$262 billion in sales volume … in 2025." A1011–16. The company—and its CEO, Reffkin—have been vocal, public opponents of the CCP. Compass contends that the CCP is directly at odds with Compass's marketing plan, called Phased Marketing Strategy. A1131. This strategy includes a "Private Exclusive" phase in which listed properties are made available to "340,000 top agents across [***Compass's***] network of brokerages" but ***not*** to non-Compass real estate professionals who otherwise cooperate and compete with each other via the MLS. A1132.

Compass has opposed the CCP for years.[6] Its CEO has publicly noted that Compass voted against the policy in 2019 and that it "has consistently lobbied NAR and the local MLSs for the removal of the policy."[7] A1174. Recently, Compass's campaign against the CCP has become even more aggressive. In July 2025, Compass announced that its agents would purposely violate the CCP by withholding listings from MLSs.[8] A1095. Compass's senior-most executives, including Alexander, have been in contact with a PLS co-founder, Mauricio Umansky, in their "quest" to challenge the CCP. For example:

- On September 7, 2024, Umansky sent Reffkin an email titled "Introduction CCP," introducing him to a reporter and asking how Umansky could "help and continue with the quest." Reffkin responded by adding "[Alexander] our head of strategy" to the email and proposed a meeting. A1018. ***how important PLS.com v. NAR, the Ninth Circuit decision, is to Compass***." A7.

[6] *See*, *e.g.*, A1157–60 (urging NAR and MLSs to "remove 'mandatory' rules like Clear Cooperation"); A1162–66 (calling support for the CCP "all financially motivated"); A1180–89 (urging MLSs to stop enforcing the CCP and warning of litigation risk).

[7] A1174–78.

[8] A1094–98.

- Then, on September 15, 2024, Reffkin emailed Umansky an advance copy of a writing criticizing the CCP. A1020. ("While the Clear Cooperation Policy may appear to serve a noble purpose of transparency, it imposes restrictions that must be questioned…" and "it is an ethical imperative to challenge such policies"). *Id.*

- On January 16, 2025, Alexander sent Umansky a detailed "summary of our perspective" on the CCP. A1024. It included "stats from several surveys of homeowners, which demonstrate consumer demand for the option to list off-MLS…", asserts that the CCP "poses immediate and serious legal risk," that "[t]he DOJ has opened two anti-trust investigations into Clear Cooperation," and that the CCP "has led to Private Listing Service (PLS) . . . suing NAR," A1024-25; and points homeowners to Compass's website, www.compass-homeowners.com, A1028. Reffkin replied, "I hope you find this helpful Mauricio." A1024.

- On July 30, 2025, Alexander sent Umansky an email forwarding an industry article which referenced "how important PLS.com v. NAR, the Ninth Circuit decision, is to Compass" in connection with Compass's litigation against an MLS. A7.

Escalating its challenge to the CCP, Compass has threatened multiple MLSs around the country with "potential antitrust litigation" for having "a rule requiring real estate professionals to submit listings to the MLS and consequently market their clients' homes only as allowed" by the rules of the respective MLS. A22; A1152; A1169. Compass concluded these letters with a clear threat: "***we will spend millions of dollars to sue [you] and other MLSs to accomplish those goals***." A24; A1154; A1171. And Compass is in active litigation with at least six separate MLSs over their cooperation rules that track the CCP. A1144. Two of those cases are in this Court,[9] and one—which Compass brought—is in the Central District of California,[10] where Compass is asking Judge Vyskocil to transfer ***all*** of the MLS-related litigation. A1100.

[9] *Cal. Reg'l Multiple Listing Serv. Inc. v. Compass, Inc.*, No. 26-cv-08796 (S.D.N.Y. Oct. 5, 2026); *Ariz. Reg'l Multiple Listing Serv., Inc., et al. v. Compass Inc.*, No. 26-cv-09253 (S.D.N.Y. Oct. 22, 2026).

[10] *Compass Inc. v. Cal. Reg'l Multiple Listing Serv. Inc.,* No. 5:26-cv-06121 (C.D. Cal. Oct. 16, 2026).

## II. NAR's Subpoenas and Compass's Objections

PLS—not NAR—involved Compass into the underlying case. PLS identified five Compass witnesses, including Alexander, in its initial disclosures. A29–31. PLS described these five individuals identically as witnesses who may testify about "[c]onsumer demand for off-MLS listing services, the Clear Cooperation Policy and its anticompetitive effects." *Id.* Compass's false accusation of retaliation is refuted by what actually happened.

- **July 20** – NAR served subpoenas for depositions and documents on Alexander, Cortazzo, Flagg, Perkins, and Tutor—the only Compass witnesses on PLS's initial disclosures.[11] A39–166; A168–296; A298–426; A428–555; A557–685. At the same time, NAR served subpoenas on all other non-Compass brokers in PLS' disclosures as part of routine discovery to avoid surprise should any testify at trial.

- **July 23** – PLS circulated to NAR a friendly Notice of Deposition—not a subpoena—it had apparently served on Reffkin. A1030–33. NAR did not learn that PLS served a *subpoena* on Reffkin until Compass filed its MTQ. Grieves Decl. ¶ 56.

- **August 12** – For the original five witnesses, Compass served boilerplate objections to virtually every aspect of the subpoenas—from the instructions, to the definitions, to the requests themselves. A687–709; A711–37; A739–65; A767–89; A791–817. It declared that it would "not be producing any documents and will not be appearing for any depositions." A833–34.

- **August 18** – NAR attempted the first meet-and-confer with Compass to discuss its objections. A1036. Compass insisted that, as a third party, it had no duty to comply with the subpoenas whatsoever but indicated a willingness to reach a compromise in good faith. *Id.*

- **August 21** – Given Compass's apparent agreement to present Reffkin for deposition on October 13, NAR logically issued its own cross-subpoena, including document requests. A837–38; A840–968. Consistent with NAR's earlier willingness to narrow its requests, NAR's subpoena targeted nine precise requests for documents, the bare minimum to adequately prepare for cross-examination. A846–47.

- **August 26** – In NAR's effort to confer with Compass over the scope of its earlier document requests, and following days of silence, Compass summarily announced that

---

[11] Compass asserts that PLS has since dropped these witnesses from its Rule 26(a)(1) disclosures (MTQ Brief at 4), but this is incorrect. PLS has *not* amended its disclosures. Grieves Decl. ¶ 55; A1049.

NAR's new, narrow subpoena on Reffkin presented a "significant shift" in Compass's willingness to provide discovery. A826–27.

- **September 4** – Compass served boilerplate objections to NAR's subpoena on Reffkin. When NAR directly asked Compass to "confirm your position that Compass's CEO is agreeing to testify but … unwilling to produce any documents," Compass responded that Reffkin "does not agree to testify." A823.

- **September 22** – Compass told NAR that it was considering offering Alexander for a deposition in the place of Reffkin. A1036.

- **September 28** – NAR replied:

> ***We remain open to further meeting and conferring*** to address any concerns you have with NAR's subpoenas to Compass witnesses. But we will not allow Compass to unfairly assist PLS in this litigation by making PLS's chosen witness or witnesses available for depositions while simultaneously refusing to produce other documents or witnesses in response to NAR's subpoenas. A1037.

- **October 5 –** Compass stated that it would "stand an all of its objections." A996.

- **October 9** – Compass proposed what it called its "final offer":

> Compass will put up Alexander, who is the individual at Compass most likely to have information potentially relevant to this case, for one deposition of five hours. No other Compass or Compass-affiliated witnesses will be appearing for a deposition. ***Compass will not be producing any documents***, as it has already previously produced hundreds of documents. ***If the parties do not accept,*** Compass will have no choice but to ***move to quash all of the subpoenas*** under Fed. R. Civ. P. 45. A1000 (emphasis added).

- **October 10 –** PLS announced that it would not accept these terms, stating its continued desire for Reffkin's testimony. A1002.

- **October 13 –** NAR said that it would "not agree to allow Compass's CEO or any other executive to sit for a limited deposition in which NAR cannot effectively cross-examine because Compass refused to comply with validly served subpoenas." A1005. And NAR proposed ***once again*** to negotiate with Compass to narrow its "document requests and address any burden concerns [Compass] may have." *Id.*

- **October 15** – With the fact-discovery deadline a month away, PLS suddenly suggested that it may agree to Compass's proposal for only Alexander's testimony. A1039-40. NAR promptly replied that it would not sit idly by observing PLS's and Compass's deal-making and would enforce its own subpoenas. A1043-44.

- **October 19** – Compass sent a letter announcing that it would effectively give PLS what it wanted—Alexander's deposition—while contesting all of NAR's subpoenas: "Compass will be moving to quash all subpoenas that NAR has issued to Compass executives and Compass affiliated agents, with the exception that Compass continues to offer NAR its fair share of Alexander's five-hour deposition." A1008. Compass agreed with NAR that the parties have exhausted their meet-and-confer efforts on this matter. *Id.*; *see also id.* at 2.

## III. COMPASS MOVES TO QUASH

On October 23, Compass filed its motion to quash. NAR, reciprocally, cross-moves to compel the production of the last, ***narrowest*** set of document requests that NAR included with the Reffkin subpoena. Those narrow requests are a subset of what NAR sought from Alexander. If Compass had ever been willing to negotiate in good faith, those are the minimum records NAR would have pursued.

NAR and Compass anticipate parallel proceedings in the C.D. Cal. over NAR's subpoenas on the Compass witnesses who reside in that district. NAR proposed to Compass, for efficiency and consistency, that all motion practice occur in C.D. Cal. Compass refused.

## ARGUMENT[12]

***First,*** this Court should transfer this dispute to C.D. Cal. under Rule 45(f). Transfer would promote judicial economy and avoid piecemeal litigation over NAR's subpoenas.

---

[12] Compass says that this Court should apply the law as interpreted by the Ninth Circuit because that is the location of the issuing court. MTQ Brief at 6 n.3 (citing *Harapeti v. CBS Television Stations Inc.*, No. 21 MISC. 680 (PAE), 2021 WL 3932424, at *2 n.2 (S.D.N.Y. Sept. 2, 2021)). Compass's authority in turn draws from *In re Ramaekers*, where the court rejected the concept of "choice of law" when "the choice involves the law of two or more circuits." 33 F. Supp. 2d 312, 315 (S.D.N.Y. 1999). Subsequent decisions have explained that *Ramaekers* does not stand for the proposition that federal law as interpreted by the issuing court controls and instead apply the law as interpreted by their home circuit. *See, e.g.*, *New York v. Microsoft Corp.*, No. CIV A. 98-1233 (CKK), 2002 WL 649492, at *2 (D.D.C. Apr. 8, 2002) ("[I]n no case cited in *Ramaekers* . . . did a court addressing issues of federal law apply the law of a circuit other than the law of the circuit in which that court sits."). This Court should therefore apply the law as interpreted by the Second Circuit. At any rate, NAR cites both Second and Ninth Circuit law.

***Second,*** this Court should, in the alternative, compel Compass to produce the documents that are further described in Part II below. These are a narrowly tailored set of directly relevant requests that do not impose undue burden on Compass. Without these documents, and given Compass's demonstrated hostility to the CCP, NAR would face extreme prejudice in its ability to adequately examine Alexander, whose own correspondence with Umansky shows her bias. Compass's boilerplate objections—coupled with its persistent refusal to negotiate NAR's requests—are without merit. Not only has Compass failed to show undue burden, but the documents Compass identifies as its shield for further production are out of date, produced years ago pursuant to a *PLS* subpoena, and from a single different custodian.

***Third,*** the Court should deny Compass's sanctions request—which is frivolous at best. NAR has always acted in good faith given that PLS, not NAR, injected Compass witnesses into their underlying case. NAR's position has been fair and consistent: if Compass is willing to produce any witness for testimony, it cannot unfairly deny NAR discovery. Compass refused every one of NAR's efforts to discuss the scope of its document requests.

## I. THE COURT SHOULD TRANSFER THIS DISPUTE TO C.D. CAL.

As a threshold matter, NAR moves this Court to transfer this action and this dispute to C.D. Cal. under Rule 45(f), which permits transfer "if the court finds exceptional circumstances."

Those circumstances arise here. Compass is not an unsophisticated or vulnerable third party. It is the country's largest residential real estate brokerage with over $260 billion in sales volume in 2025 alone. A1011-16. It has threatened to "spend millions of dollars to sue" MLSs all over the country for rules like the CCP, and it has followed through on that threat. A24; A1154; A1171. This month, after one MLS sued Compass in this district, Compass sued it in C.D. Cal. *Compass, Inc., et al. v. Cal. Reg'l Multiple Listing Serv. Inc.*, No. 26-cv-06121 (C.D. Cal. Oct. 16,

2026). Compass has asked that another action by six other MLSs be related and transferred to C.D. Cal. A1100-02.

***Avoiding piecemeal litigation***. NAR and Compass will already be litigating there over the Compass witnesses who live in California. Rule 45(f)'s primary "focus[] on avoiding piecemeal litigation" alone warrants transfer. *Am. Plan Adm'rs v. S. Broward Hosp. Dist.*, 39 F.4th 59, 61 (2d Cir. 2022); *see also Mountain Farms, LLC v. Rural Cmty. Ins. Co*., 301 F.R.D. 426, 430 (N.D. Cal. 2014). One court should decide all of it.

***C.D. Cal. knows this case***. There can be little doubt that the C.D. Cal. is the court "best-positioned to address the subpoena dispute given the nature of the dispute and the posture and complexity of the underlying action." *Hilb Grp. of N.Y., LLC v. Associated Agencies, Inc.*, No. 23-MC-264 (LJL), 2023 WL 5183690, at *1 (S.D.N.Y. Aug. 10, 2023) (cleaned up); *see also E4 Strategic Sols., Inc. v. Pebble Ltd. P'ship*, No. SAMC1500022DOCDFMX, 2015 WL 12746706, at *3 (C.D. Cal. Oct. 23, 2015) (identifying factors including "the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation." (cleaned up)). That court has "already set out a discovery schedule in the underlying action." *See Hilb Grp. of N.Y., LLC*, 2023 WL 5183690, at *1.

The C.D. Cal. is also familiar with the complex history of this case, another factor favoring transfer. It has presided over the underlying dispute since 2020 and is therefore better equipped to address the issues in dispute. *See Allstate Ins. Co. v. Deng*, No. 25-MC-137 (GHW) (RWL), 2025 WL 1183051, at *2 (S.D.N.Y. Apr. 21, 2025) (granting the motion when another judge was "best suited to determine the . . . motion, particularly given the complexity of the case, the posture of the case, and the discovery issues already raised and continuing to develop"), *report and recommendation adopted*, 2025 WL 1313426 (S.D.N.Y. May 6, 2025) (Woods, J.). Compass

insists that it is not "clear what relevant information these executives may have" and that NAR seeks "highly irrelevant information." MTQ Brief at 9. Who better to judge that assertion than the court that will ultimately decide what evidence will be admitted and what will not?[13]

***Compass is not burdened.*** Transfer would impose no meaningful burden on Compass. Compass's attorneys are located in C.D. Cal., and Compass is currently suing an MLS there on related issues while seeking to move two more related actions there from this District. Compass can still present Alexander for deposition in New York. But there is no burden on it to litigate its motion to quash (and NAR's motion to compel) in C.D. Cal.

This is precisely the circumstance in which a Rule 45(f) transfer is warranted. *See*, *e.g.*, *Cui v. Agua Fria Senior Living LP*, No. CV 26 MISC. 406 (SLC), 2026 WL 2884404, at *3 (S.D.N.Y. Sept. 25, 2026) (transferring nonparty subpoena dispute to issuing court in Arizona over nonparty's objection because that issuing court was already managing discovery schedule and was best positioned to decide enforcement). This Court should therefore transfer this motion to quash with NAR's cross-motion to compel to the Central District of California under Rule 45(f).

## II. THIS COURT SHOULD COMPEL THE PRODUCTION OF NAR'S LAST SET OF NARROWED REQUESTS.

If this Court does not transfer, it should deny Compass's motion to quash and grant NAR's cross-motion to compel the production of the documents NAR needs for examination as outlined below.[14]

[13] Notably, PLS refused NAR's request to provide any further clarity or detail, beyond its generic Rule 26(a)(1) disclosure, *see supra*, about the nature of its planned examination of Alexander.

[14] To the extent Compass may protest that those requests were directed at Reffkin and not Alexander, (1) Compass adamantly *refused* to discuss the scope of any requests; (2) those requests fall within the scope of the broader requests in the Alexander subpoena; and (3) NAR would have sought those narrow, targeted requests *regardless* of which Compass executive testified.

A subpoena may request information from a third party that "is relevant to the claims and defenses and proportional to the needs of the case." *de Jesus v. Cao*, No. 1:24-CV-09901, 2026 WL 1230841, at *3 (S.D.N.Y. May 5, 2026) (citing Rule 26(b)(1)). That said, the issuing party may not impose an "undue burden or expense" on the subpoena recipient. *Pandora Jewelry, LLC v. Blue Time, Inc.*, No. 22-MC-238 (AT) (RWL), 2025 WL 3214075, at *2 (S.D.N.Y. Nov. 18, 2025) (quoting Rule 45(d)(1)). "Once the moving party demonstrates relevance and proportionality, the burden then shifts to the party opposing discovery to show that the information sought is privileged or unduly burdensome." *In re Orthogen Int'l GmbH*, No. 23-MC-152 (VSB)(KHP), 2026 WL 320454, at *5 (S.D.N.Y. Feb. 5, 2026) (cleaned up); *see also Blagman v. Apple Inc.*, No. CV138496PSGPLAX, 2014 WL 12607841, at *3 (C.D. Cal. Jan. 6, 2014) ("It is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery.")

Compass relies heavily on purported undue burden to argue that the subpoenas be quashed. *See* MTQ Brief at 5–6. Below, NAR addresses why Alexander's agreement to sit for a deposition makes her threshold, categorical refusal to produce any documents untenable. Her documents are relevant—NAR cannot fairly cross-examine her without them—and her generic claims of undue burden fail. NAR then addresses the relevance and burden factors in the context of the specific, narrowly tailored document requests that are the basis of its motion.

**A. Compass cannot offer Alexander for a deposition while refusing to produce documents relevant to her likely testimony.**

Compass served boilerplate objections to all of NAR's document requests. A687–709; A711–37; A739–65; A767–89; A791–817. Even after NAR tried to confer with Compass to discuss the scope of NAR's requests, Compass refused. But now that Compass has announced its willingness to present its Chief Strategy Officer, Alexander, for deposition, it cannot deny NAR a

reasonable opportunity to obtain documents to properly cross-examine her. Compass's brief misses the threshold link between its decision to offer Alexander for a PLS-friendly deposition and the relevance of Alexander's documents for NAR's cross-examination. NAR addresses that point before explaining the relevance of its pinpoint document requests in Part II.C.

***Documents are necessary for cross-examination***. "[T]he various discovery methods are more complementary than fungible." *In re Dana Corp.*, 574 F.3d 129, 150 (2d Cir. 2009). Axiomatically, documentary evidence may contradict deposition testimony; documents are necessary for scrutiny of a witness's oral claims. *Id.*; *see also, e.g.*, *In re DiDi Glob. Inc. Sec. Litig.*, No. 21-CV-5807 (LAK), 2025 WL 1735412, at *5 (S.D.N.Y. June 23, 2025) ("There are myriad reasons, from imperfect memory to intentional obfuscation, why written or oral answers are imperfect substitutes for document production."). As one court has aptly put it, "documentary evidence is often necessary to assist in the examination of a witness, either to show inconsistencies or to refresh the witness' recollection." *Tennison v. City & County of San Francisco*, 226 F.R.D. 615, 622 (N.D. Cal. 2005). Denying NAR any documents from Alexander would thus deny NAR access to the relevant information that it needs to effectively cross-examine her.

***PLS's vague disclosures heighten the need***. Exacerbating this prejudice, PLS has refused to detail the testimony it expects to elicit. Its Rule 26(a)(1) disclosures vaguely describe her potential subjects of testimony as:

> Consumer demand for off-MLS listing services, the Clear Cooperation Policy and its anticompetitive effects.

A29-31. PLS identified the same subjects for all Compass witnesses, including the two New York-based Compass executives as well as the three California-based Compass agents. When NAR asked PLS for more information on this point, PLS once more referenced this general disclosure

and added that Alexander has "interacted with NAR directly on Clear Cooperation issues."[15] PLS in no way ties Alexander's anticipated testimony to any precise subject. Nor has it promised to limit its questioning to matters supported by documents that have already been produced. A1047–48.

This vagueness makes it hard to see how Alexander, Compass's Chief Strategy Officer, could even testify from personal knowledge on PLS's proffered subjects. For example, testimony about "[c]onsumer demand for off-MLS listing services," A29–31, would seem to be based on hearsay and likely inadmissible expert testimony. But—because her deposition testimony may well be played at trial as she is outside the C.D. Cal.'s subpoena power—fairness demands that NAR obtain the documents to adequately examine her. If her testimony is germane, Compass's documents relating to that testimony are relevant. Further, as explained in more detail in Part II.C, NAR has narrowed the scope of its requests to Alexander to pinpoint the discovery it seeks (without imposing an undue burden on Compass). *See, e.g.*, A828.

***Compass cannot have it both ways***. Again, PLS—not NAR—injected Compass into this case when it named Compass's witnesses in its initial disclosures. Now, Compass and PLS have agreed on a course that benefits both. They want Alexander to provide testimony critical of CCP—and thus helpful to PLS—while preventing meaningful cross-examination that might undermine that testimony. Compass cannot have its cake and eat it, too. It must produce Alexander's documents to ensure fair cross-examination. And NAR's narrowed requests for those documents,

---

[15] In connection with Alexander's interactions with NAR, PLS points—still with no specific citations—to documents that NAR has produced. A1047. NAR explains below why its production of a small number of documents that include Alexander, on a narrow subset of topics, does not moot its subpoena requests here.

discussed below, are eminently proportional to the needs of the case given the amorphous nature of the testimony PLS will seek to elicit from Compass in support of their shared anti-CCP position.

**B. Compass's boilerplate claims of undue burden are unfounded.**

Undue burden turns on "relevance, a party's need for the documents, whether the documents are available from other sources, the particularity with which the documents are described, and costs," as well as "whether the requested information can be obtained from the parties themselves." *Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co. LLC*, No. 21 CIV. 10753 (DEH), 2024 WL 3498850, at *1 (S.D.N.Y. July 22, 2024) (citations omitted); *see also, e.g.*, *Stati v. Space Expl. Techs. Corp.*, No. MC2000023FMOAGRX, 2020 WL 5766270, at *1 (C.D. Cal. Sept. 8, 2020) (similar). "The standard applicable to depositions is similar to the standard for document subpoenas." *Great Am. Ins. Co. v. Gemstone Prop. Mgmt., LLC*, No. 23-CV-9100 (LJL), 2026 WL 353609, at *1 (S.D.N.Y. Feb. 9, 2026) (citation omitted).

***1. Boilerplate objections are flatly improper.***

It is well-established that boilerplate objections fail. *E.g.*, *Great Am. Ins. Co. v. Gemstone Prop. Mgmt., LLC*, No. 23-CV-09100 (LJL), 2025 WL 1166993, at *1–2 (S.D.N.Y. Mar. 17, 2025) (finding objections to Rule 45 subpoena lacked good faith where they were all "virtually identical"); *Nguyen v. Lotus By Johnny Dung Inc.*, No. SACV1701317JVSJDEX, 2019 WL 4570032, at *4 (C.D. Cal. Apr. 12, 2019) ("General or boilerplate objections are improper - especially when, as here, she has failed to submit any evidentiary declarations supporting most of her objections.").[16]

---

[16] NAR agrees with Compass that, if Alexander or Perkins sits for a deposition, it will occur in New York. MTQ Brief at 7 n.4.

Compass may not simply assert objections based on a purported burden without explaining the precise burden compliance imposes. But Compass's responses to every subpoena served by NAR assert these improper generic burden objections. *See, e.g.*, A695 ("Alexander objects to the Definition of 'Communication' as vague, ambiguous, overly broad, and unduly burdensome to the extent it goes beyond the ordinary definition of the word.").

Compass's absolute refusal to negotiate further undermines its claim of undue burden. NAR proposed narrower requests and repeatedly attempted to negotiate in good faith. A818–35. Compass never reciprocated. "[G]iven [NAR's] willingness to address [Compass's] concerns so as to make the subpoena less burdensome to respond to, the subpoena does not place an undue burden on [Compass]." *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 522 (S.D.N.Y. 2016). Rather, Compass's generic assertions of burden fail as a matter of law. *See, e.g.*, *Great Am. Ins. Co.*, 2026 WL 353609, at *1 ("The obligation for sitting for a deposition does not, in and of itself, demonstrate undue burden." (cleaned up)).

Compass is willing to present its second-most senior executive for deposition, yet it invokes its third-party status to evade corresponding discovery. "Third parties with relevant information are not exempt from discovery simply because no claims are asserted against them." *Securitas Elec. Sec., Inc. v. DeBon*, No. 20CIV5323CMJW, 2022 WL 633874, at *2 (S.D.N.Y. Mar. 4, 2022); *see also Blagman*, 2014 WL 12607841, at *3 (explaining that third parties are "not immune" from "the burdens of discovery" and may not "simply invoke generalized objections" to avoid their obligations). This is especially so for third parties who, like Compass and Alexander, have a strong interest in the outcome of the case. *See In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 302–03 (S.D.N.Y. 2003) (considering in part a third party's practical interest in a case

to determine "who should bear the costs of non-party production"); *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277, 281 (N.D. Cal. 2017) (same).

As it stands, Compass has agreed to one-sided compliance with the parties' subpoenas in a way that helps only PLS while baselessly claiming undue burden as to NAR's document requests. If Compass can put up a deponent, it can at ***least*** produce the corresponding documents.

***2. The documents NAR seeks are not available from other sources.***

Only Alexander and Compass can provide the documents responsive to NAR's targeted requests. The documents the parties themselves have produced that involve Compass employees are limited in scope. For example, NAR has identified roughly 200 documents from its own sizable productions that include Alexander, generally from 2024 or later; they consist of Compass's emails to NAR expressing its purported concerns over the CCP, which are largely matters of public record. These documents do not reflect Compass's ***internal*** deliberations about the CCP. Nor, as far as NAR can tell, could they sufficiently support the broad range of testimony PLS suggests it may elicit from Alexander. Her documents have never been searched. PLS has indicated that it expects to question Alexander beyond the scope of already-produced materials, so it is eminently unfair to deny NAR the documents it seeks to properly cross-examine Alexander. Compass cannot wholly avoid its discovery obligations on this threshold basis.

***3. Compass's threadbare* PLS I *production does not address NAR's requests.***

Finally, Compass's main excuse for flatly refusing document production is that it produced about 250 documents in *PLS I*. MTQ Brief at 1. That is a red herring. ***Those few documents were produced in response to a subpoena from PLS, not NAR***. A1043. The production came from a single custodian, not Alexander. *Id.* It contained two documents from 2021 and no documents dated beyond July of that year. Much has happened since, including NAR's review of CCP in late

2024, during which NAR invited input from Compass and other industry stakeholders. A1107–A1119. PLS has raised that issue in depositions of NAR witnesses in this litigation along with Reffkin's September 2024 email on fair housing. Compass's campaign against the CCP escalated into the MLS litigation referenced above. From September 2024 through at least July 2025, Compass's CEO and Alexander communicated with Umansky about their "quest" against the CCP. A1018; A4–A19. And Compass now touts homeowner surveys from January 2025 and a price analysis built on transactions from April 2025 through March 2026. A1023–A1028; A839–A968, Req. 6. None of these issues is (or could be) reflected in the small *PLS I* production.

### C. NAR's document requests are narrowly tailored to pinpoint relevant documents without imposing an undue burden.

As recently as October 13, NAR again offered to have a discussion on the scope of its requests. A1005-06. Compass refused. Accordingly, NAR moves to compel on the narrow subset of documents that it identified in its Reffkin subpoena—issued ***after*** Compass objected to all of NAR's other document requests as unduly burdensome. A846–47. These are the minimum documents NAR would have sought for *any* Compass executive deposition. They fall into five categories.

***First***, NAR seeks documents concerning Compass's approval (or disapproval) of its agents' use of PLS and the degree to which Compass agents in fact used PLS or services like it:

> 1. Documents and Communications sufficient to show Compass's approval, disapproval, prohibition, or endorsement of Compass Agents' use of any listing platform offered by ThePLS.com, LLC and/or TheNLS.com.[17]
>
> 2. Documents sufficient to show the number or percentage of residential property listings offered by Compass Agents that were listed on any listing platform offered by ThePLS.com, LLC, TheNLS.com, or any other Private Listing Network.

[17] "TheNLS.com" is a successor website to PLS, created by the same founders.

A846.

These documents relate directly to one of the broad topics PLS proffers for Alexander's potential testimony: "[c]onsumer demand for off-MLS listing services." A844–45. Alexander has already spelled out Compass's position on that topic. Her January 2025 memorandum to Umansky cites homeowner surveys "which demonstrate consumer demand for the option to list off-MLS," and asserts that "[a]bout 20% of all listings at MRED today start on their Private Listing Network," which she says demonstrates "the demand for this type of flexibility by sellers and agents." A1024; A1026. Reffkin, for his part, has told Umansky that off-MLS listings are "protected from the risks of the MLS." A1140. PLS's damages and causation theories rely on that demand. PLS contends that agents, buyers, and sellers wanted its services and would have used them more but for the CCP. How the country's largest brokerage actually treated PLS, and how often its agents actually used off-MLS platforms, bears directly on those theories.

Request 1 seeks only documents "sufficient to show" Compass's policy. It is not, as Compass suggests, the equivalent of a request for all communications criticizing PLS. *See* MTQ Brief at 11 (attempting to equate the two requests). As for Compass's argument that NAR should ask PLS about the number of Compass listings on PLS's services, *id.* at 11–12, Compass misconstrues the request. NAR seeks information about off-MLS listing networks *other* than PLS, and it requests "the number or percentage" of Compass agents' listings on such services. A846. PLS would not know how many Compass listings are *not* placed on the PLS—nor how many are placed on the PLS *and* an MLS. To the extent PLS and Compass make claims relating to the demand for such listings, NAR is entitled to documents relating to those claims. Given how central off-MLS listings are to this case, any burden is minimal by comparison.

***Second***, NAR requests documents concerning Compass's business model encouraging off-MLS listings (in contradiction of the CCP):

> 6. The "Compass analysis that used a doubly robust causal inference methodology combining outcome regression (log transformed close price model) with inverse probability weighting (IPW)" referenced at https://www.compass-homeowners.com/ and the data comprising the "70,809 closed Compass residential transactions listed between April 1, 2025 and March 31, 2026" that underlie that analysis.
>
> 8. All non-public and non-privileged Documents and Communications reflecting Compass policies and procedures concerning any iteration of Compass's Three-Phased Marketing Disclosure.

A846–47.

Request 6 seeks the data behind a study that Compass prominently features on its website purporting to show that off-market listings benefit sellers. Alexander told Umansky that the same website was "resonating with homeowners," and it appears in her email signature. A1028. NAR believes that this study may well serve as the basis for Alexander's anticipated testimony relating to off-MLS listing demand.

Similarly, Request 8 concerns Compass's policies on seller disclosures related to their off-MLS marketing strategies. Compass's CEO has framed off-MLS marketing as protecting sellers from "days on market" and "price drop history." A1140. How Compass actually discloses the trade-offs of that strategy to sellers is central to PLS's previewed "less restrictive alternative" theory. PLS has suggested similar disclosures mitigate some of the competitive harm CCP is intended to alleviate. Alexander, as Chief Strategy Officer, will presumably endorse that business model. NAR needs Compass's internal policies on the disclosure to test her account against the company line.

These requests are not unduly burdensome. Request 6 seeks a single study and its underlying data, which should be readily accessible. A846. Request 8 involves a narrow request,

too. Instead of asking for any and all documents about Compass's business model generally, it focuses on the policies related to Compass's disclosure form to mitigate any claim of burden. There is no suggestion that NAR can get these materials elsewhere. Alexander must produce them.

***Third***, NAR requests documents concerning Compass's views on the supposed antitrust implications of NAR's policies, especially the CCP:

> 4. All Communications with the United States Department of Justice concerning NAR policies, including the Clear Cooperation Policy.
>
> 7. If you intend to offer testimony that other industry actors face legal exposure if they abide by any NAR policy including but not limited to the CCP and MLOS,[18] any and all Documents and Communications to support this position.

A846.

These requests speak to a broad testimony topic from PLS's initial disclosures: "the Clear Cooperation Policy and its anticompetitive effects," which essentially encompasses PLS's entire claim. A29–30. Alexander has already put Compass's position in writing. Her January 2025 memorandum asserts that the CCP "poses immediate and serious legal risk," that "[t]he DOJ has opened two anti-trust investigations into Clear Cooperation," and that "[i]t's crucial that we limit our legal exposure from mandatory NAR rules." A1024-25. NAR is entitled to know the basis for that testimony—including what Compass actually said to, and heard from, the DOJ. It is not clear to NAR how Alexander, as Chief Strategy Officer, could testify on these subjects as a percipient witness. Compass's letters with the DOJ would fill that gap, as would its documents discussing supposed legal exposure in the industry.

As for undue burden, Request 7 is explicitly contingent on Alexander offering such testimony. A847. NAR can hardly do more to mitigate the burden to Compass. And Request 4 is

[18] "MLOS," which stands for Multiple Listing Options for Sellers, is a NAR policy related to the CCP.

so precise—letters with the DOJ—that Compass should be easily able to collect the responsive material with a few search terms. NAR cannot get these documents from PLS.

***Fourth***, NAR requests documents concerning litigation funding of lawsuits against NAR policies like the CCP:

> 3. All Documents and Communications concerning litigation funding for legal matters related to NAR policies, including but not limited to the Clear Cooperation Policy.

A846.

This request seeks documents—if any exist—that go directly to bias, given Compass's threats of and engagement in extensive litigation to attack the CCP. Documents that reveal a witness's bias are discoverable. *See, e.g.*, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2024 WL 97359, at *3 (S.D.N.Y. Jan. 9, 2024) (permitting a deposition and document discovery to determine if litigation funding supported plaintiff bias against defendant); *Davis v. Kelly Servs., Inc.*, No. CV 17-1699-GW (PLAX), 2017 WL 11633478, at *7 (C.D. Cal. Oct. 23, 2017) (denying a motion to quash a third-party subpoena in part because "documents that tend to implicate credibility, such as disciplinary records and performance evaluations, are discoverable" (citation omitted)). If Compass has been supporting or otherwise facilitated litigation funding for cases challenging NAR policies, including the CCP, NAR may fairly inquire into that bias.

Only Compass has these documents, if they exist at all. Indeed, if no responsive documents exist, Compass could say so after a reasonable search.

***Fifth***, NAR requests documents concerning materials that Alexander used to refresh her recollection:

> 9. All Documents You used to refresh Your recollection under Federal Rules of Evidence 612.

A847.

This is a typical document request, yet Compass asserted the same blanket objections it raised to everything else. *See, e.g.*, A992 ("Reffkin additionally objects to this Request as unduly burdensome and overly broad in requesting data for 'all' documents. Reffkin also objects to this Request as unduly burdensome and overly broad in seeking information from an overly broad time period."). If Alexander is deposed, NAR has the right to review the documents she used to refresh her recollection. Such documents are directly relevant to her testimony and credibility. And the request is contingent on Alexander's use of such documents, mitigating any claim of undue burden.

These requests are narrowly tailored to pinpoint the most relevant documents for Alexander's testimony and minimize any burden Compass may claim. NAR thus requests that the Court order that Alexander produce documents responsive to the above requests, in Compass's possession, custody, or control, from January 1, 2017, to the present. Alexander must produce them in time for NAR to sufficiently review them before her deposition. NAR also moves to compel as to its deposition subpoena on Alexander as review of her documents may reveal that she should sit for seven hours instead of the five hours to which Compass and PLS have agreed. *See* Fed. R. Civ. P. 30(d)(1).[19]

## III. THE COURT SHOULD NOT AWARD SANCTIONS.

Finally, this Court should deny the Compass executives' request for sanctions. Their request is predicated on the unfounded accusation—including material misstatements of facts—that NAR issued the subpoenas in bad faith as an oppressive tactic to discourage them from testifying. MTQ Brief at 13–14. This claim is baseless and completely false. NAR pursued proportionate discovery against only those Compass witnesses PLS specifically injected into the

[19] Compass has agreed with PLS to offer Alexander for a deposition, so NAR does not address the suggestion that high-level executives should not be deposed per the apex doctrine. MTQ Brief at 12–13.

case. PLS first brought Compass into this case through its Rule 26(a)(1) disclosures, prompting NAR's routine subpoenas to understand the testimony they might offer at trial and the documents supporting or contradicting it. Contrary to Compass's assertion, those disclosures were never amended and to this day include the Compass witnesses. Days after NAR issued those subpoenas, PLS circulated a notice of deposition for an undisclosed witness who also happened to be Compass's CEO (with Compass's apparent consent). A1030–33. Only then did NAR serve its narrowly-tailored subpoena to Reffkin. A840–968.

Compass's accusations of retaliation are thus based on demonstrably false representations of fact. NAR issued its first set of subpoenas ***before*** it learned about PLS's intent to depose Reffkin; at the same time, it issued substantially identical subpoenas on every brokerage-affiliated witness in PLS's Rule 26(a)(1) disclosures who had not previously been subpoenaed, regardless of their stance on CCP. Indeed, a major purpose for the subpoenas was to ascertain that stance in the event they were called to trial.

Compass has provided no facts demonstrating that NAR's subpoenas impose an undue burden. *See Preston Hollow Cap. LLC v. Nuveen Asset Mgmt. LLC,* 343 F.R.D. 460, 470 (S.D.N.Y. 2023) (holding the objecting party did not meet its burden to submit evidence showing the subpoena was unduly burdensome). Nor can Compass credibly claim undue burden. Throughout the process, ***NAR*** was the party attempting to negotiate with Compass to reach a mutually agreeable solution that would avoid motion practice and would allow NAR to get the documents needed to adequately approach the ever-changing potential Compass deponent or deponents. Had Compass engaged in good faith instead of resting on boilerplate objections and shifting positions, this discovery dispute could have been avoided.

NAR does not deny that it would withdraw its document subpoenas if no Compass witness testified. MTQ Brief at 14. That is the entire point. If Compass is going to agree with PLS to put up a hand-selected witness for testimony, NAR must insist that it have a fair chance for cross-examination. And given the ever-shifting positions of Compass and PLS, NAR needed to preserve its right as to each possible witness. Even now, things are not certain: NAR understands that PLS has not withdrawn its subpoena to Reffkin, and PLS has confirmed that it never amended its initial disclosures to remove any Compass witness.

Still, for present purposes, NAR is willing to operate under the assumption—***preserving its rights if things change***—that Compass and PLS have agreed to depose only Alexander in her role as Compass's second-in-command. That means that NAR is entitled to relevant documents over which she has possession, custody, or control in that capacity. A holding to the contrary would severely prejudice NAR and endorse the gamesmanship Compass has deployed throughout negotiations.

## CONCLUSION

Compass is no bystander. Its CEO and the very executive it now offers have worked with Umansky on their "quest" against the CCP, and Alexander has already memorialized the positions PLS wants her to repeat. Compass cannot volunteer a senior executive witness for deposition but hide documents relevant to her testimony. Yet, Compass refused every effort to discuss scope and stood on invalid boilerplate objections.

The Court should transfer this dispute to the Central District of California. Alternatively, it should deny the motion to quash, compel production of a narrow class of Compass documents (reflected in the Reffkin subpoena) in advance of Alexander's deposition, and deny sanctions.

Dated: October 27, 2026

Respectfully submitted,

/s/ *Jacob M. Kaplan*

Jacob M. Kaplan
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Tel.: (212) 891 3896
jacob.kaplan@bakermckenzie.com

Suyash Agrawal
Constance Grieves (pro hac vice forthcoming)
MASSEY & GAIL LLP
50 East Washington Street, Suite 400
Chicago, IL 60602
Tel.: (312) 283-1590
Sagrawal@masseygail.com
cgrieves@masseygail.com

*Attorneys for Respondent The National Association of REALTORS®*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(C)

The undersigned, counsel of record for the National Association of REALTORS®, hereby certifies that this memorandum complies with the word-count limitation of Local Rule 7.1(c).

This memorandum relies on the word count of the word-processing system used to prepare it, and contains 8,626 words, excluding the parts of the brief exempted by Local Rule 7.1(c).

/s/ *Jacob M. Kaplan*
Jacob M. Kaplan